KELLY v. OVERSEAS SHIPPING CO., Inc.

(District Court, E. D. New York. December 17, 1923.)

1. Shipping ⊙58(2)—Duty of showing barge seaworthy when offered for loading was on libelant.

In suit for damages to barge, alleged to have been caused by owners of seagoing barge in loading cargo of coal therein, duty of showing that barge was seaworthy when offered for loading was on libelant; and if there was doubt it must be resolved against him.

2. Shipping ⊙58(2)—Barge held to have been seaworthy when offered for loading.

Barge, when offered for loading of coal from seagoing barge, held, under evidence, to have been seaworthy and fit for service for which she was offered.

3. Shipping ⊙54 — Manner of loading coal barge held to have been cause of her sinking.

Evidence of loading coal barge from seagoing barge, by placing coal amidships over protest of captain, whereas it should have been distributed at bow and stern, held to have been cause of her going down in the middle and her seams and planking to open and leak and generally to cause her to sink; captain of barge not being compelled, with force and arms, to contend against the force of numbers in directing loading.

4. Shipping ⊙54—Sinking of barge held to have been due to negligent manner of loading coal thereon from seagoing barge.

Seaworthy coal barge was hauled alongside seagoing barge for loading of coal therefrom, coal was negligently loaded amidships over protest of barge's captain, and barge was caused to go down in the middle and planking to open and leak. Held, under evidence, that duty was placed on foreman of seagoing barge to stop loading when he discovered barge to be in danger, and his negligence in thereafter loading coal caused barge to sink.

Decree affirmed 7 F.(2d) 734.

Macklin, Brown & Van Wyck, of New York City, for libelant.

Baldwin, Barns & Weeks, of New York City, for respondents.

CAMPBELL, District Judge. This is a suit in admiralty for damages to barge, cargo, and captain's effects, alleged in the libel to have been caused by the negligence of the respondent, its servants, agents, and employees, in loading the cargo. The respondent by its answer denies that the alleged injuries and damage were caused by its negligence or that of its servants, agents, and employees, and alleges that the same were caused by the unseaworthiness of the barge and the negligence of the master of the barge.

On June 12, 1922, the barge Estelle Kelly was taken to the foot of Twenty-Ninth street,

Brooklyn, to load a cargo of coal from the seagoing barge Luzon.

On June 13, 1922, the barge Estelle Kelly was seaworthy, and the servants, employees, and agents of the respondent hauled the barge alongside the Luzon, from which several small barges had been loaded. They then commenced to load the barge Estelle Kelly; the captain being at the store making some purchases. The Estelle Kelly was a 6-beam boat; that is, she had six beams running athwartships, which formed what might be called 6 hatches, which for convenience are in this suit numbered aft from the bow, 1, 2, 3, 4, 5, and 6, but the hold was not divided into 6 compartments, but was open below deck from bow to stern.

The loading commenced about noon on June 13th, and continued until 5 o'clock p. m.; the coal being raised out of the Luzon in buckets loaded in wheelbarrows, which were wheeled along a runway and dumped into a chute leading into the barge. These runways were some distance above the deck of the barge. The foreman of the respondent commenced to load the barge Estelle Kelly in hatch No. 3, and continued with his loading during the first day in that hatch, against the repeated protests of the captain of said barge, and when the captain finally, to prevent further loading in that manner, attempted to cast off his stern line, the said foreman of the respondent threatened the captain with bodily harm, and, leaving only the eye on the cleat on said barge, took all the remainder of the line on the Luzon, where the captain of the barge was unable to get it. The captain also complained to the checker, a runner of the respondent.

About 80 to 100 tons of coal were placed on said barge amidships on the first day, and none at the bow or stern, and she was allowed to lie all night in this condition.

On June 14th the respondent commenced loading at 8 o'clock a. m. with two gangs, and continued all day until 5 o'clock p. m., with the exception of one hour at midday.

The same foreman was in charge for respondent. They were loading mostly amidships, and the captain of the barge Estelle Kelly again complained that too much coal was being loaded amidships, but no attention was paid to his protest.

About 3 o'clock p. m. on June 14th the foreman of the respondent saw water coming in at the seams of the Estelle Kelly amidships, but continued loading the barge. At 5 o'clock p. m., there then being about 600 tons of coal on the barge, the foremen of the

respondent stopped loading the barge, and had her moved alongside of the Edward G. Murray, a barge which had been loaded and made fast with a bow and stern line.

When the captain of the barge returned, he found the barge alongside of the Murray, and about 9 o'clock p. m., having found 20 inches of water in the barge, he hooked up his gasoline pump and pumped her until the pump sucked. He then retired aboard the barge Estelle Kelly.

About 3:30 or 4 o'clock a. m. there was a cracking sound, which was heard by the captains of the Estelle Kelly and of the Edward G. Murray, who both realized that the Estelle Kelly was sinking, and the captain of the Estelle Kelly saved himself by getting off the barge, while the captain of the Edward G. Murray, whose barge was being dragged down by the Estelle Kelly, and who was made fast alongside, cut the bow and stern lines and let her sink.

There was a great conflict in the testimony in this case, but I have seen and heard the witnesses, and in its essential features I accept as true the story told by libelant's witnesses.

Respondent claims that the barge Estelle Kelly was not seaworthy, and offers the testimony of its foreman and several of the workmen to show open seams and oakum falling out; but, if what they say is true, then the risk of loading the said barge must have been apparent, but nothing was claimed to have been said about that by them at any time on the first day.

The total amount of coal loaded on this barge by respondent was about 600 tons, and this barge had been loaded with about 550 tons of coal, but 50 tons less, and lying loaded at a dock from April 24 to June 8, 1922, and was towed from Pier 64, North River, to Twenty-Ninth street, Brooklyn. The captain said he had been on the barge for a year, that she was in good condition, her capacity being 725 tons of coal, and that he had carried a full cargo. It was also shown that she had been kept in good condition.

[1, 2] The duty of showing that the barge Estelle Kelly was seaworthy when she was offered for loading was upon the libelant, and, if there was any doubt, it must be resolved against the libelant. The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688. This duty the libelant has in my opinion successfully performed, as I am convinced that said barge was at that time sea-

worthy and fit for the service for which she was offered.

[3] There was great conflict as to the manner in which the barge was loaded during the first and second days, but I accept the story of the libelant's witnesses which I believe to be true, and find that during the first day all the cargo then loaded, being 80 to 100 tons, was, over the repeated protests of the captain, placed amidships, whereas it should have been distributed at bow and stern, and that, by reason of the manner of loading the said barge by the direction of respondent's foreman, over the protests of the captain, the said barge was caused to go down in the middle, her seams and planking at the butts to open and leak, and generally caused to sink.

There can be no question about the duty of the captain with reference to loading the barge, but he is not compelled single-handed, with force and arms, to contend against the force of numbers in directing such loading, but under such circumstances may rest secure on making his protest, and I find that sufficient protest was made by the captain of the Estelle Kelly to the foreman of the respondent, and that the captain was competent to perform his duties as such captain.

I do not think the case of Aktieselskabet Fido v. Lloyd Braziliero (C. C. A.) 283 F. 62, cited by respondent, is in point, because in that case the master was a seaman and man of experience, capable of commanding and sailing a ship—a very different position from that of captain of a barge which must always be towed by some one else.

[4] The duty was placed on respondent to stop loading if they discovered the barge to be in danger (The Robert R., 255 F. 37, 166 C. C. A. 365), and yet, by the testimony of the respondent's foreman, it appears that he saw water coming in at a seam, and must have known of the threatened danger, yet they continued to load the barge for two hours after that time, and, if her seams above the water line were open as testified to by respondent's witnesses, it would be almost a certainty that the barge would sink.

The duty was undoubtedly on the libelant to furnish a competent captain of the barge, and this he did; and the fact that the captain went to bed on the barge, after pumping her out until the pumps sucked, shows no lack of competency, but simply that he had been unable to ascertain the extent of the damages to the Estelle Kelly, caused by the improper manner of loading, because they were under water. Nor do I think the competency of the captain can be challenged because he was absent at times from the barge, because I believe that most of those occasions were caused by his efforts to protest and to inform the libelant or his representative.

I therefore find that the libelant was in no way to blame, and that the blame was solely that of the respondent.

The usual decree may be entered in favor of the libelant, with costs, and an order of reference will be granted.