## THE HARPER NO. 145.

## THE INDEPENDENCE HALL.

District Court, S. D. New York. February 23, 1928.

**1. Shipping ⬭58(2¾)—Inference of unseaworthiness at beginning of loading operations, from overturning of loaded barge which has sprung leak, may be overcome.**

While overturning of a barge, carrying a cargo, which has sprung a leak, justifies inference that she was unseaworthy at beginning of loading operations, or at inception of charter, this inference may be overcome by explanation or rebuttal evidence.

**2. Shipping ⬭58(2¾)—Unseaworthiness at beginning of loading of barge, which, after being loaded from vessel and shifted, overturned, held not proven.**

Unseaworthiness at beginning of loading operations of a barge chartered to receive cargo from ship, which, after being loaded and shifted by the stevedores to make room for a lighter, capsized and dumped load into the slip, *held* not proven.

**3. Shipping ⬭58 (2¾)—Negligence of stevedores in handling and abandoning in slip a loaded barge, which shortly afterwards capsized from water entering through fresh break in plank, held inferable.**

That there was negligence of stevedores in handling and abandoning in a slip a barge which, after loading from a ship, they had shifted, and which shortly thereafter capsized, undoubtedly from water entering through a break in a plank not existing when the loading began, *held* inferable from the circumstances.

**4. Shipping ⬭54(2)—Charterer and stevedores, continuing loading of barge over protest of bargemaster that it was being overloaded, held guilty of joint negligence.**

Charterer of barge for receiving cargo from ship and stevedores *held* guilty of joint negli-

gence and lack of ordinary care and prudence, in continuing loading of barge over objection of bargemaster that it was being overloaded; so that some of the water that came into the barge and caused her to capsize, having come in because of the overloading, the charterer contributed to the disaster.

In Admiralty. Suit by the J. W. Higman Company against the scow Harper No. 145, A. J. Harper, claimant, and the Moran Towing & Transportation Company; the Weeks Stevedoring Company, Inc., and the steamship Independence Hall, being impleaded. Decree for libelant against respondent companies.

Duncan & Mount, of New York City, for libelant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for Moran Towing & Transportation Co.

Macklin, Brown, Lenahan & Speer, of New York City (J. Dudley Eggleston, of New York City, of counsel), for the Harper No. 145.

Slayton & Jackson, of New York City (G. Noyes Slayton, of New York City, of counsel), for Weeks Stevedoring Co.

HAZEL, District Judge. A cargo comprising 800 tons of chalk arrived upon the steamship Independence Hall at Pier No. 2, Hoboken, N. J., and the barge Harper No. 145 was chartered from her owner by respondent, Moran Towing & Transportation Company, to receive the cargo alongside the steamship. On August 27th 450 tons were loaded on her, and on the next day the stevedores, continuing loading under instructions from their foreman until midday, loaded 234 additional tons. The barge was comparatively new, having been built in May, 1924. She was 110 feet long and 34 feet beam, equipped with pumps fore and aft. At noon the stevedores were directed to shift the Harper to make room for the lighter Wesley, which had arrived to take her place. The captain of the Harper at this time left her, and he observed soon afterwards that the barge had dangerously listed, and before the arrival of a tug to pump her out, she capsized, dumping her load into the slip. The weather was equable. The barge is asserted to have been in leaky condition. This condition was attributed by libelant to her unseaworthiness; also that she was overloaded under instructions of the agent of the charterer, and that the Weeks Stevedoring Company was negligent in shifting her.

The libel was filed in rem against the barge in question and in personam against her owner and the charterer, while the latter, under the fifty-sixth rule of admiralty, brought in the Weeks Stevedoring Company, Inc. No liability is claimed against the steamship, and the petition against her may be dismissed.

The principal questions litigated in this three-sided contest are whether the upsetting of the Harper was due to her unseaworthiness at the inception of the charter, or to the broken plank in her stern, which, in all probability, it is said, was caused by the stevedores in shifting her, or to improper loading or overloading. Libelant contends that it should have a decree against all three tort-feasors; that is, against the Harper in the first instance, and have execution for any unpaid amount against the charterer, and the remaining balance, if any, against the impleaded Stevedoring Company.

[1, 2] 1. Although it is true that the overturning of a vessel, lighter, barge, or scow, carrying a cargo, which has sprung a leak, justifies the inference that the vessel was unseaworthy when the cargo was taken aboard, or at the inception of her charter, yet this inference may be overcome by explanation or rebuttal proof. For example, if the barge in question became unseaworthy or unfit to transport the cargo during the progress of loading and overloading, or from moving her in the slip, she can scarcely be held at fault, unless there was a failure to maintain her in a seaworthy condition, which implies knowledge on the owner's part that she had actually become unfit for the purpose for which she was used. However, libelant claims that the proofs support the inference of unseaworthiness.

It is shown that, upon being surveyed following the accident, the bottom of the barge Harper was constructed wedge-shaped, and that some of the wedges had partially worked out of the seams which had been caulked, while the side seams and ends had only two threads of oakum in them without the use of any cotton. The witness Cummerford, one of the surveyors, testified that her condition was such that in all probability there had been leakage from the seams on the sides and ends, and also that amidships the closing plank was sprung off on the right side, which left an opening of about an inch; and it looked to him as though water had come into the hull at that point. But, in his opinion, the proximate cause of the sinking was the broken plank at the stern under the

water line, which, he added, may have been caused by contact in shifting the barge.

I have considered, not only the testimony of Cummerford with relation to her unfit condition, but also the testimony of witnesses Vaughan, Tracey, Hunter, and Finkenauer, which libelant claims was corroboratory; but I am not satisfied of the barge's unseaworthiness, for the services in which she was to be employed, at the beginning of the loading operation. Indeed, I think that she was in proper condition, and that the implied warranty of seaworthiness was not breached. There were no defects, either known or unknown, that rendered her unsuitable for her employment, or for transporting a capacity load of cargo. There is creditable testimony by her builder, the witness Bushey, and by Pritchard, a shipbuilder and marine surveyor, that she was turned out tight, staunch, and strong, and fit for carrying cargoes of the kind usually loaded upon deck scows. Bushey was present at the survey, and, according to him, her bottom and sides were in good condition, her bottom having been caulked with a soft pine wedge, which he considered better than oakum, and her sides with three stands of oakum and double cotton; that there was no bottom leak from opening seams, although the caulking had slightly started, but this, he thought, was due to the raising operation, and to straining her bottom and sides when she capsized.

I was impressed by the truthfulness of this witness, and think that he was right in his testimony that overturning the barge and raising her were responsible for the opening of seams described by other witnesses. Whatever bottom leakage there was was not of such consequence as to cause the disaster. She had had no previous trouble, although in continuous service from the time she was chartered. Her master deposed that she was tight and had not leaked at any time before May 14th, and, moreover, that he sounded her on the morning of the mishap and found her dry. His manner of sounding was criticized, it being suggested that the rod used by him might have rested on a beam. But his testimony as to what he did, and the manner in which he ascertained the absence of water, has greater weight and preponderates over that of other witnesses suggesting that the sounding was not properly taken. Barber testified that, prior to moving the scow, she was on an even keel, and only after the barge was shifted at noon did he observe her list to starboard; while Wiggins says that, before moving her, she was on an

even keel and looked all right to him, though he averred that the captain told him she leaked.

There was testimony bearing upon the probability of bottom leakage before the barge was moved, and the captain of the tug Beetle swore that he noticed a list, at 11 o'clock, while the loading was still going on, of about 45 degrees to starboard; but, as to this, I am unconvinced. I credit the testimony, on this point, of the witnesses who first noticed her list at about noon, after moving her away from the steamship. If she had listed before this time, the longshoremen shifting her, it is safe to assume, would have remarked upon it.

[3] 2. No reason is presented for doubting that the barge overturned owing to water entering a broken plank in her stern—a new break that was shown by the survey to be an opening of 4x12x34". It was the sixth plank under the overhang under the water line, with a load of 684 tons of chalk. This break, I find, did not exist when the loading began. It concededly was sufficient to permit enough water to enter her hold in a short time to list and capsize her. How the fracture of the plank was caused does not appear. No direct evidence bears thereon, and hence we must look to the probabilities, taking into consideration the situation, facts, and circumstances. If the hole was caused in some way while moving the boat from time to time one-half her length during the loading, it would account for water entering prior to the final shift away from the steamship. But later on, when the starboard list was first seen, the chalk, which was loaded pyramidal fashion, was seen to start moving downward as the list became greater.

The evidence substantially shows that these men, engaged in shifting the barge, did not faithfully complete their work before leaving for their midday repast. They abandoned the barge without making her fast to the pier, or to any boat in the slip, as they might have done. They intentionally allowed her to drift over towards the bulkhead of the pier, and it is not improbable that her stern plank came in contact with an obstruction of some sort, or it may have been contact with the overhang with such force as to split or fracture the plank. Indeed, a blow to the overhang might readily break a plank underneath the surface of the water, taking into consideration her loaded condition. No list to starboard was observed until perhaps a half or three-quarters of an hour after the men ceased shifting her, and, though the tug

Beetle was called to her aid, she could not apply the pumps quickly enough to stop the increasing list and roll over. She sank after 1 o'clock or perhaps 1:30, about 200 feet from the place where she was loaded; and since there is no evidence that the plank was not broken while the barge was alongside the steamship, and her list only observed after the shifting, and while adrift, I think it is fairly inferable that there was negligence and carelessness in handling and abandoning her, rendering her liable to injurious contact. The impingement, resulting in the broken plank, no doubt was the proximate cause of the sinking.

[4] 3. The Weeks Stevedoring Company, however, was not alone to blame for the disaster, since I think that the charterer must be held liable for insisting on continuing the loading of the barge, despite the protest of her master that the barge would not carry 800 tons. Of this protest the charterer and the foreman of the stevedores were apprised early in the forenoon; but the charterer, by its representative, Cunningham, who was not sworn, at about 10:30 a. m., ordered the foreman of the stevedores to continue the loading until noon. The barge having become unseaworthy under such directions, without the knowledge and consent of the owner, the charterer must be deemed to have been at fault, and, assuming that some water came into the boat because of overloading, the charterer contributed to the ensuing disaster. Both the Moran Towing & Transportation Company and the foreman of Weeks Stevedoring Company should have heeded the objection of the bargemaster, since, in his judgment, the condition of the boat indicated that a continuance of the loading was fraught with danger. It was their duty to stop the loading. Failure to do so was an act of joint negligence and lack of ordinary care and prudence. The Robert R. (C. C. A.) 255 F. 37; Kelly v. Overseas Shipping Co., Inc. (D. C.) 7 F.(2d) 732; The Evelyn (C. C. A.) 282 F. 250; The Adah (D. C.) 245 F. 378. The supposition entertained by the charterer that the Harper would safely carry 800 tons of cargo does not, under the evidence, exonerate it.

My conclusion is that the unseaworthiness of the barge Harper No. 145 was not proven, and as against her and her owner the libel must be dismissed; but, as to the Weeks Stevedoring Company and Moran Towing & Transportation Company, a decree may be entered, holding them in equal fault for the disaster, and equally liable for the damages sustained.