## THE ADAH.

(District Court, E. D. New York. July 31, 1917.)

1. SHIPPING ⬦121(2)—SINKING OF SCOW—SEAWORTHINESS.
   A deck scow, which sinks while being loaded by reason of ordinary leaking through open seams, although she is listed, so that one rail is even with the water, is unseaworthy, and may be liable for the cargo lost.
2. SHIPPING ⬦62—CHARTER OF LIGHTER—RESPONSIBILITY FOR MASTER.
   A charter of a scow with her captain for lighterage purposes is not a demise, in a complete sense of making the captain the servant of the charterer for all purposes.
3. SHIPPING ⬦58(2)—CAPSIZING OF LIGHTER—SEAWORTHINESS.
   The capsizing of a deck scow, just after the completion of her loading from a steamship, held, on the evidence, not due to leaky condition or unseaworthiness in any other respect for which the owner was liable.
4. SHIPPING, ⬦123—CAPSIZING OF LIGHTER—NEGLIGENT LOADING.
   The capsizing of a lighter and loss of her cargo held due to the negligence of the contracting stevedore in failing to properly trim the cargo.
5. SHIPPING ⬦123—STOWING CARGO—DUTY OF STEVEDORE.
   Stevedore is liable to deposit cargo safely, even if not under contract to trim.
6. SHIPPING ⬦209(3)—LIMITATION OF LIABILITY.
   The respondents may so raise affirmative issues as to try the issues between each other in a liability limitation, which would otherwise not raise the question of negligence.

In Admiralty. Petition of Charles A. Fox, as owner of the deck scow Adah, for limitation of liability. Decree for petitioner.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for petitioner.

Burlingham, Montgomery & Beecher, of New York City (B. W. Wells, of New York City, of counsel), for the Uller.

Alexander & Ash, of New York City, for Jacobus & Grauwiller.

Harrington, Bigham & Englar, of New York City, for Beer, Sondheimer & Co., Inc.

Kirlin, Woolsey & Hickox, of New York City (John M. Woolsey and Robert S. Erskine, both of New York City, of counsel), for Brady & Goie, Inc.

CHATFIELD, District Judge. The deck scow Adah capsized, with a cargo of copper concentrates, on the morning of April 24, 1915. By petition to limit liability, the owner of the Adah has brought all the parties concerned into court, and the various issues have been completely tried. The relations of the various parties and the determination of responsibility will be reserved until the cause of the capsizing and the primary responsibility therefor have been considered.

The Adah was a new deck scow, 112 feet long by 33 feet beam, and having an outside depth amidships of 10 feet. She had been well constructed, of good material, by competent builders, and finished in December, 1914. She lay in the water at a dry dock in Brooklyn, protected by other vessels from exposure to storm and wind, until about the 10th of April, 1915, when she was chartered by Jacobus & Grau-

willer to carry cargoes of copper concentrates from steamships which were to dock at Freeman street, Greenpoint. From this point the ore was to be taken to the reduction plant at Chrome, N. J. This ore is of a consistency resembling moist clay, or sticky, damp, hard mud. It is extremely heavy and sluggish in movement, being so solid as to be only plastic, and is brought from Cuba in the holds of cargo vessels, from which it is removed in buckets slung overboard at the end of a derrick boom.

The Adah was being loaded alongside the steamship Uller, which had much higher sides than the lighter, even when the loading was started. The derrick was lashed firmly in place, and the stevedores moved or caused the scow to be moved along the side of the vessel, in order to bring the place where the load from the bucket was to be dumped under the fall. The testimony is that this bucket could be swung some 5 feet from one side to the other; but the loads were dumped so as to continually create a ridge about one foot to port of amidships. The Adah was fastened to the vessel by two spring lines and two breast lines, the breast lines running to the starboard or outer side of the scow; and some two hours before the loading was finished the Adah had a list to port, or toward the vessel, sufficient to bring her rail down to the surface of the water.

Cargo was placed on during those two hours at the rate of about 25 tons per hour. According to the figures of the Adah, obtained by subtracting the amount delivered from the amount tabulated and billed as going into the Uller, the Adah then had on board a load of 745 long tons. Figuring from actual displacement, the Adah was able to carry, before her decks would be awash, an amount of 770 odd tons, and if, as some of the witnesses testify, the port rail was even with the water amidships, while the starboard rail was 2 feet or 2½ feet out of water, the load, if the boat were floating freely in that position, would amount to about 650 tons.

It is thus certain that the Adah must have been supported by something besides her own displacement, if she was carrying 745 tons and displacing but 600-odd tons of water. Further, it has been proven beyond dispute that a load of 650 tons would not render the Adah unstable, even if so placed as to bring one rail, at amidships, even with the surface of the water. In fact, the load of 745 tons, with one rail even with the water, would not put the Adah in unstable equilibrium. There is no dispute about the foregoing propositions, nor is there any great dispute as to the movements of the boat herself, but the principal contradictions occur with respect to the actions and statements of the witnesses at the time.

The captain of the Adah testifies that he objected to the way the Adah was being loaded, that the stevedore paid no attention to his objections, that he thought the list dangerous, and ultimately went on board another barge to avoid accident. The stevedores used a steel cable fastened to a winch upon the vessel to start the Adah forward when she was fully loaded and when the lines were cast off. This was the method in which the scow had been moved previously. The tide at the time was running to the north under the dock alongside which the

Uller was moored; the steamship being bow in and having her starboard side to the wharf. The tide was thus running through the piling of the wharf, past the bow of the steamer, and also under the steamer, before reaching the Adah, while she was lying alongside. One of her lines was carried to the pier ahead of the steamer, and then around the bulkhead, so as to draw the Adah a little upstream and to shore after she was started by the cable from the steamer. As she moved out ahead of the steamer, and was caught by the tide sweeping past the bow of the steamer, she began to go under at the stern port corner.

Evidently the shifting of her load and the effect of water running in over the side capsized her almost immediately, for in so doing she turned bottom up; but, while turning, her starboard rail went high enough out of water to land up over the rail on the deck of the Uller, and the starboard rail was evidently torn off as the boat slid down into the water. One of the witnesses testifies that she rocked both ways; but, if so, it does not change the testimony as to the cause of the occurrence, and all of the other witnesses agree that, when the boat started to turn to port, she continued until she went clear over.

Much testimony has been introduced as to whether a boat of this age could have become unseaworthy through deterioration of the caulking in her seams above the water line. The testimony is all to the effect that the Adah had not been leaking up to a very short time before the accident. Her captain testifies that he tried with a pump in the stern port corner a very short time before the accident and could get no water. If leaking occurred, it must have been because of opening of the seams above the ordinary low-water line, under the influence of the heavy deck load and the list to port.

[1] A seaworthy boat is intended to undergo such loads and lists, and if the accident occurred from ordinary leaking through open seams, the Adah would be responsible herself for the results of the accident. U. S. Metals Refining Co. v. Jacobus, 205 Fed. 896, 124 C. C. A. 209; The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688; The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644. The question of right to limit liability would then arise. The Loyal, 204 Fed. 930, 123 C. C. A. 252; Benner Line v. Pendleton, 217 Fed. 497, 133 C. C. A. 349. If this defense to the present action had been insisted upon in limine, the issues as to fault might have been postponed until its determination. But all the parties have joined in the hearing on the merits, and, if the fault be not laid upon the Adah, the right to limit liability is of no importance.

A number of witnesses have testified that no such accident could happen unless water were present in the hold of the vessel, and no explanation of the presence of water has been suggested, except from possible leaking, or from the situation presented by the list, and the consequent handling of the boat in removing her from the side of the Uller. Those witnesses who testify that such an accident could not happen from overloading, and that a boat could not turn turtle without the presence of water in her hold, draw the conclusion that the boat must have leaked, as they exclude in their premises any other source for the water which they conclude must have been present.

The owner of the Adah seeks to deny the presence of water from leaking, and also denies the presence of any water in the hold, unless it came there after the deckload had brought the port rail to the surface of the water, and after the captain had sounded with his pump, but half an hour before the accident.

The weight of the load of concentrates is, of course, inclusive of any additional water absorbed by the concentrates, if the port rail was below the surface to a sufficient extent to allow the water to reach the ore. In this way some additional weight could have been added to the cargo before the ore became wet enough to slide. The testimony of all the witnesses is to the effect that the port stern corner of the Adah was low from the load at the stern, but that the hatchways in the stern deck, which were open, would not be reached by water coming over the rail, until the boat had listed to a point where she would ordinarily dump her cargo. In fact, some of the experts testify that the boat could not list to a sufficient extent to put either stern hatch under water before the cargo would be substantially dumped off. But this cargo was sticky, and would not slide, and the witnesses agree that the boat went on over before the load moved.

A remarkable piece of testimony was given by one of the stevedores, who said that, just as the accident happened, he was called by the captain to come and listen at the rear hatch. He heard water running with a "terrible noise." The sound so alarmed the captain that he went to call the stevedore. The witness, however, stayed on the vessel, which almost immediately turned over, and he had to jump into the water. The evidence shows that the lighter, when it overturned, went up over the side rail of the vessel at such a point that the end of the scow could not have moved much beyond the bow of the vessel, up to that time. The witness, who testifies to the sound of water running in, was looking in the port hatchway in the stern deck. He states that at that time no water was running over the deck, and yet, according to all the witnesses, the vessel already had a heavy list, and, immediately on being moved, settled at the stern so that she was apparently tripped; that is, her stern port corner went under the water, which then poured into the hatchway and caused the overturning.

If, as stated by the experts for the respondents, the load would have dumped before the vessel rolled over, unless water in the hold caused the stern to settle so as to let water in the hatch, it is impossible to conclude that water from leaking was just running aft. The vessel had been down at the stern and listed to port for two hours, and during that time had been pumped, and no water found. Either something happened from the strain caused by the different conditions already described, so as to let in water in large quantity, or the water poured into the hatch. In either way a condition might be created which would have the effect of tripping the vessel and rolling her over before the cargo could dump, so as to allow the boat to come back to an even keel.

While the Adah was resting alongside the vessel in the water, the effect of the breast lines to the outside of the scow would be merely to hold up the outer or starboard side of the lighter, and her displacement would cause her to roll; but, if the port rail did not go under

water, the total displacement by the load, if the boat were free in the water, would still be less than sufficient to cause an overload. The only explanation, which is possible, of sustaining a greater load than would be indicated by the displacement in the water, is that the strain of the lines produced friction against the side of the vessel, and that the port side of the lighter may have caught upon the side of the vessel, so as to hold the scow suspended until the lines were cast off.

Doubt is sought to be thrown upon the strength of these lines to sustain such a weight as would create any appreciable overload. But the actual parting strength of the lines in use cannot be accurately estimated, and in the face of the testimony that the boat had not been making water, and that the deckload was actually sufficient to put the boat below the point where she rested before being moved, no other explanation has been suggested. It will be observed that, if the upper seams of the vessel had opened, so that water came in before the vessel was moved, it would have added weight, so as to cause greater displacement, and would have the effect of causing the scow to settle lower in the water than has been shown by the testimony, before the scow moved, unless even in this case the lines and the contact with the side of the vessel had held her up.

It will be held, therefore, that the evidence does not show the presence of any water in the scow, which would indicate leaking, before she was moved from the side of the vessel. It will also be held that the scow was overturned by the presence of a load which actually weighed more than the scow could carry under the circumstances, and with which she could be safely moved in the manner described, from the side of the vessel and across the swiftly running tide. If water then rushed into the vessel, it must have entered, either from the position in which the port rail was allowed to remain awash, or from the change in the equilibrium which was occasioned by the release of the vessel's support and the sudden movement given her by the wire cable, which started her quickly astern. It is argued that the tide did not run fast, as the boat was not carried to the other side of the slip. Evidently the Adah met some tide as she went by the end of the Uller, and this may have aided in the tripping. But, if not, we have no different problem.

[2] The captain of the scow cannot be held responsible for the existence of the conditions shown, nor the manner in which the vessel was handled thereunder. The owner of the scow is responsible for the care of the scow by his captain, so far as the loading or observation of her carrying capacity depends upon matters peculiarly within his knowledge, and not ascertainable by ordinary observation of the charterers or of the stevedore. The charter is not a demise, in the complete sense of making the captain the servant of the charterer for all purposes. Hastorf v. F. R. Long-W. G. Broadhurst Co., 239 Fed. 852, —— C. C. A. ——. But in this case the captain was in no way negligent, and neither the owner nor the charterer is made liable by his acts.

[3] The owner of the scow has sustained the burden of showing seaworthiness and proving a sufficient explanation of the accident, and upon the whole testimony the respondents have not established un-

seaworthiness or a leaky condition for which the owner is responsible. The matter has passed beyond the stage of presumption. The overturning without explanation might of itself raise a presumption of unseaworthiness or of tenderness. U. S. Metals Refining Co. v. Jacobus, supra; The Kathryn B. Guinan, 176 Fed. 301, 99 C. C. A. 639. But the testimony presented by the owner has more than rebutted such presumption, and has overcome even the evidence offered to show the presence of water in the vessel, for which the owner could be held responsible.

[6] The petition to limit liability should generally, therefore, result in a dismissal of the claims to the fund created and a finding in favor of the petitioner as to his right to limitation. But the various parties have made it necessary to consider their relations to the matter and to each other. Instead of disavowing responsibility and urging seaworthiness of the vessel, the charterers have contested the petition and the right to limit liability, and have sought to pass on the claim which they would naturally deny, as if they were responsible therefor. The Uller has fought the petition, in order to claim damages from the Adah, and thus has in effect excused the stevedores and cargo owners, but does not absolve the charterers. In fact, the steamer and cargo owners have begun actions in admiralty against the stevedores and the charterers, who in turn brought in the owner, and thus caused him to limit liability. But, as has been already stated, in order to contest the petition to limit liability by raising all issues, the entire question has been tried in this case. The parties have all opposed the petitioner as if liable themselves, and have in addition compelled him to prove for them the issues raised in the damage suits.

[4, 5] The scow was chartered by Jacobus & Grauwiller, who furnished her to Beer, Sondheimer & Co. to carry this particular cargo. Beer, Sondheimer & Co. were under contract with the owners of the cargo to transfer this cargo, when received over the side of the vessel, and to deliver it at Chrome, N. J. The vessel was under agreement to furnish certain tackle and power for use of the stevedores, and there is no evidence in the case that there was any negligence on the part of the vessel, or defect in its furnishings, for which the vessel should be held responsible. In making the contract with the stevedores, Beer, Sondheimer & Co. refused to allow an extra charge for trimming the cargo, as the cargo was to be delivered from the buckets in such a way that trimming was thought to be unnecessary. The stevedores, therefore, undertook to do no trimming beyond that of dumping the cargo upon the deck. But such a contract carries with it responsibility to so dump the cargo as to safely load the vessel. The testimony in the case indicates that the lashing of the derrick boom in a fixed position, and the rigging of the boom so that the load was deposited in a ridge to one side of the center, and so as to cause a list, proves a violation of the implied warranties created by the agreement to deliver the load safely upon the deck of the scow in such a manner as to enable the scow to safely receive and carry the amount which should be expected on observation to be a proper load.

The testimony shows that this was the first scow loaded from the vessel, and the first load of this material which these stevedores had handled. The load was of such a nature that it would not roll or fall as far from the line of dumping as would occur with dry material, like gravel or ordinary dirt. The material was plainly heavier and stickier than the ordinary material. For the handling of such material, and for its placing in the proper position, the stevedores were responsible. The captain of the scow protested against the manner of delivery and the resultant position of the load. The stevedores paid no attention to this protest. The stevedores, also, were responsible for the maintenance of the lines from the vessel and the use of those lines in moving the scow from the side of the vessel.

No negligence has been shown on the part of Jacobus & Grauwiller in the carrying out of their contract, and if their refusal to pay for trimming resulted in the creation of conditions which made it unsafe for the stevedores to carry out the contract literally, the remedy would not be a reckless continuance of loading, without regard to consequences. The stevedores, upon observing such a situation, should have discontinued operating under the contract, or should have performed the extra work necessary and settled responsibility therefor with the parties concerned.

Considering the privities involved in the particular contract shown, responsibility must rest primarily upon the stevedores, and secondarily upon Beer, Sondheimer & Co., who hired the stevedores to do the work. As the stevedores appear to have been in all respects independent contractors, to an extent sufficient to cover responsibility for the accident, the damage to the Uller can result only in a claim against the stevedores, and, if they are unable to respond to the same, against Beer, Sondheimer & Co. as surety therefor; but no claim is proven against Jacobus & Grauwiller or the Adah, and hence none against Fox, whose petition to limit should be granted, if liability did exist.

The petitioners may have costs against all the parties, except the Uller. No costs to any other party as against the other respondents.