## THE CARY BRICK CO. NO. 8.

### SHAINE v. CARY et al.

District Court, S. D. New York. August 26, 1925.

Bigham, Englar & Jones and Leonard J. Matteson, all of New York City, for libelant.

Poore & Webster and James C. Webster, all of New York City, for claimants.

Alexander & Ash and Edward Ash, all of New York City, for Weehawken Dry Dock Co.

Foley & Martin and James A. Martin, all of New York City, for Lambert Transportation Co.

Andrew J. McElhinney, of New York City, for James B. McQuade Co.

Kirlin, Woolsey, Campbell, Hickox & Keating, Robert S. Erskine, and A. H. Combs, all of New York City, for United Port Service Co.

Fitch, Donovan & Savarese and John C. Donovan, all of New York City, for M. P. Smith & Sons Company, Inc.

Joseph E. Haggerty, of New York City, for Charles H. Gimpel.

GODDARD, District Judge. These two suits have been brought by the libelant to recover damages for the loss of cargo, which was dumped overboard from the barge Cary No. 8 when she careened as a result of leaking while at the Bush Docks, Brooklyn, N. Y. The two suits and the pleadings are practically identical, except that one is against

the barge Cary No. 8 in rem, and the other is against the owners of the barge in personam. The material allegations in both libels set forth that on or about June 6, 1918, the libelant placed on board the Cary No. 8, then lying at Pier 2, Jersey City, a cargo to be transported from there to Bush Docks, Brooklyn, in order to be placed on board the steamship City of Rangoon; that on June 13, 1918, while the barge, laden with the greater portion of her cargo, was lying at the Bush Docks, she careened and dumped her cargo "by reason of the unseaworthiness of the said barge, Cary No. 8, and the negligence of those in charge of her, in the stowage, custody, and care of said cargo." The Cary No. 8 was a wooden barge, 114 feet long, 34 feet wide, with a cargo capacity of 1,000 tons.

In April, 1918, Cary and Gailor, her owners, chartered her, with the service of the barge captain, to the Weehawken Dry Dock Company, who thereafter subchartered her to the Lambert Transportation Company, which in turn subchartered her to the James B. McQuade Company, who were in possession of her at the time the loss occurred. These were all oral charters; the charter from Lambert Transportation Company to McQuade being confirmed by letter of May 17, 1918, from the Lambert Company to McQuade. McQuade entered into a contract with R. D. White & Co., who were the shipping agents of the libelant, to carry a cargo of about 12 carloads of mixed steel, totaling some 514 tons, consisting of iron bars, kegs of nails, and hoop irons, owned by the libelant.

The cargo was placed on board the Cary No. 8 by McQuade on June 6, 1918, and the barge towed to the Bush Terminal, arriving there June 11th. M. P. Smith & Co., Inc., the stevedores who were loading the City of Rangoon at Bush Terminal, were employed by McQuade to unload the cargo and put it aboard the Rangoon, and on the day of her arrival they removed 38 tons of the cargo from the stern end of the barge. After this cargo was taken off, it was noticed that the barge listed, and she was found to be leaking to such an extent that her position was thought to be precarious, and White & Co. employed Gimpel, another stevedore, to sort the cargo and rearrange it, in an effort to get her on an even keel and keep her afloat.

On the morning of June 12th, Gimpel went aboard the barge with his men and, finding that the barge was leaking badly, immediately notified White & Co., and was given orders by White & Co. to do everything possible to keep the barge afloat, and Gimpel and his men spent the day in watching and shifting the cargo, preliminary to having it put on board the Rangoon by Smith. M. P. Smith & Co. were paid by McQuade, who later rebilled to the libelant's agents.

The barge captain, Olsen, testified that, up to the time the 38 tons of cargo was removed, it had only been necessary to pump the barge 15 minutes each day; that after this occurred he had to pump each two or three hours, for a period of half an hour, and that, while Gimpel was shifting the cargo, the leaking increased, so that he had to pump almost continuously; that a tug with a suction pump worked from 10:35 a. m. until 4 p. m., when she left, and from that time until about 11 o'clock he pumped almost continuously, when he went ashore for dinner and remained away about 2 hours, leaving no one to pump or watch the barge; that, when he returned, he found there was so much water in her that it was useless to attempt pumping, and about 2 a. m. on the 13th the barge careened and dumped a large part of her cargo.

Three witnesses, the president of the James McQuade Company, one of the respondents impleaded, Rodermond, president of the Weehawken Dry Dock Company, one of the other respondents impleaded, and also the captain of the barge, testified the barge was sound, well built, and, before this loss occurred, she was in good condition. There is no proof of any marine perils intervening between the time of the loading and the loss of cargo.

The original charterer and the various subcharterers have been sued or impleaded, and the Lambert Transportation Company, one of the subcharterers, in its petition impleading the United Port Service Company, charged that the shifting of the cargo was done by that company. This was denied by the United Port Service Company, which impleaded M. P. Smith & Co. and Charles Gimpel, the stevedores. Upon the trial it appeared that the United Port Service Company had no connection with the occurrence, except to furnish a checker for the cargo, and the petition against it was dismissed by consent at the end of the trial.

█ The loss was due to the leaking of the barge. The question here to be determined is: What caused the leak? On one hand, it is contended that the barge was seaworthy, and that, when 38 tons was removed from her stern, the unequal distribution of the weight of the remaining cargo produced an

unusual strain and opened up her seams, and that this strain was increased by the further shifting of the cargo. On the other hand, it is urged that this shifting of the cargo was not unusual, and would not have caused a properly built barge, in good condition, to leak.

No witnesses were called who testified that she was unseaworthy, but, when a barge leaks so that she careens and dumps her cargo, the inference is, in the absence of other cause, that she was unseaworthy. The Jungshoved (C. C. A.) 290 F. 733, 735. Experts were called, but the furthest they would go was to testify that such removal would be likely to strain a barge and open her seams. My own conclusion is, after hearing the witnesses, that, if the barge had been properly built and in good condition, this removal of cargo would not have caused her to leak. Inability to withstand the ordinary strains of loading or discharge is unseaworthiness. Penn Builders & Supply Co. v. Braeburn Steel Co. (C. C. A.) 274 F. 794. Her cargo capacity was 1,000 tons, and she had on board about 514 tons, and the amount of cargo discharged was only 38 tons, about one-twelfth of the actual load, or less than one-twentieth of her cargo capacity. There was no evidence that the decks were injured or the cargo roughly handled.

This view is consistent with the opinion in Cary v. Home Insurance Co., 199 App. Div. 123, 191 N. Y. S. 529, affirmed 235 N. Y. 296, 139 N. E. 274, where it was held the barge was unseaworthy, although in that litigation the parties and questions involved were different, and the same testimony was not offered.

While the barge captain testified she was in good condition, he admits that, even before this occurrence, it was necessary for him to pump about 15 minutes each day. I think the failure of the captain to remain at the pump or to procure assistance, instead of leaving her unattended for some two hours, and then returning and finding her past help, was a contributing cause of her filling with water.

It appeared upon the trial that McQuade paid Lambert, and Lambert paid the captain an additional $2 per day for watching, but that this watching was only in the nature of a guard for the cargo, and I think that the liability for the captain's failure to pump the barge rests on his obligation as master of the barge, for that was one of his important duties. Eclipse Lighterage & Transportation Co. v. Cornell Steamboat Co. (C. C. A.) 242 F. 927.

There was a warranty by the owner that the captain was competent to attend to the care of the barge, including pumping, mooring, watching. Dailey v. Carroll (C. C. A.) 248 F. 466.

The barge captain remained the agent and servant of the owner who continued to be responsible for his acts and negligence. Hastorf v. F. R. Long-W. G. Broadhurst Co. (C. C. A.) 239 F. 852. And the charterer became the owner pro hac vice as the charter of this barge was a demise. Monk v. Cornell (C. C. A.) 198 F. 472.

The two suits are consolidated under rule 16 of the Admiralty Rules of this district, and, in accordance with the above, the libels are dismissed against Smith and Gimpel, and the libelant may enter a decree against the Cary No. 8 in the first instance, and her owner in the second instance, and then against the charterer and the several subcharterers in the inverse order in which they are entitled to recover from one another, with the usual reference to a commissioner to determine the amount of damages.