## THE MAURICE R.
### No. 12946.

District Court, E. D. New York.
Dec. 21, 1932.

Purdy & Purdy, of New York City (by William F. Purdy, of New York City), for libelant.

Single & Single, of New York City (by George B. Warburton, of New York City), for O'Boyle.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (by Chauncey I. Clark and P. F. Shortridge, both of New York City), for Pennsylvania R. Co.

CAMPBELL, District Judge.

This is a suit for alleged cargo damage.

I find the facts as follows:

At all the times hereinafter mentioned and at the time of the trial, the libelant was

a domestic corporation organized and existing under and by virtue of the laws of the state of New York.

At all the times hereinafter mentioned, the libelant was the owner of a cargo consisting of 881 gross tons of bituminous coal, laden on board the barge Maurice R.

The barge Maurice R. was during the currency of process within this district and within the jurisdiction of this court.

At all the times hereinafter mentioned and at the time of the trial, the respondent Pennsylvania Railroad Company was a foreign corporation organized and existing under and by virtue of the laws of the state of Pennsylvania, and having goods, chattels, property, credits and effects, including floating equipment, tugs, floats, and barges, within this district and within the jurisdiction of this court.

On the 23d day of December, 1931, a representative of the Newtown Creek Coal & Coke Company called Mr. Hickey, of the claimant's office, and asked Mr. Hickey for a boat to carry between 850 and 900 tons of coal. Mr. Hickey informed the libelant that he could use the Maurice R. The barge Maurice R. was not under continuous charter to the libelant.

The barge Maurice R. was, on the afternoon of December 23d, reported to the Pennsylvania Railroad Company for towage, and on the same day she was picked up and towed down to South Amboy with other light barges by the Pennsylvania Railroad Company tug Baltimore, arriving at South Amboy at 10:20 a. m. on December 24th.

The barge Maurice R. was not placed alongside the railroad bridge but was placed alongside of the rack and two light barges were outside of her.

The coal was owned by libelant and not by the Pennsylvania Railroad Company.

There was no contract made with the Pennsylvania Railroad Company to tow to South Amboy, load and return.

Upon arrival at South Amboy the barge captain reported his boat for loading for 750 tons.

When McGonigle, the shipping clerk of the Pennsylvania Railroad Company, noticed that the boat had been reported for 750 tons and knew that the libelant's shipment was in excess of that amount, he called Mr. Brown, of the libelant, and informed him of the barge captain's registration. Brown told McGonigle that he had hired the boat from O'Boyle as capable of carrying between 850

and 900 tons of coal, and that he would get in touch with Hickey to have the matter ironed out, which he did, and Hickey got in touch with McGonigle and told McGonigle to load the boat with 850 tons.

The barge Maurice R. remained lying outside other boats alongside the rack during December 24th and throughout December 25th, but in the morning the boats inside of her were shifted and she was placed alongside the rack.

At no time while the Maurice R. was at the mooring stakes, on December 24th, 25th, or 26th, was she damaged by pounding or any other cause, and her captain did not observe or report any damage during that time, or ask for assistance.

On December 26th, at 6:15 o'clock a. m., she was shifted from the rack to the loading pier B, by the respondent's steamtug Radnor.

On December 26th, at 7 o'clock a. m., respondent received the written order mailed by the libelant on December 24th, to load the Maurice R. with approximately 900 tons of Luzino class coal, and tow her to Eagle street, Brooklyn.

On the morning of December 26th, 881 tons of coal were placed on the barge Maurice R. The boat was properly loaded, her captain made no complaint, and her freeboard was about 12 inches. 881 tons was well within the capacity of the Maurice R.

When the loading was finished, the barge captain sounded his boat and found that she had 14 inches of water in her. She was at the dumper pier waiting to be shifted into the loaded tow. The captain of the Maurice R. then started pumping with her gasoline pump, which was located on the port side aft.

The pump worked for about half an hour and pumped water out.

The pump was working when the shifting of the barge to the loaded tow by the tug Overbrook commenced, but stopped while the barge was being shifted.

As the barge was being placed in the tow, it was discovered that she was leaking, the water coming through the seam between the third and fourth planks on the port side, and through another seam between her fifth and sixth planks on the bow. The master of the Overbrook then took the barge out of the tow and put her on the mud, and sent his deckhand and engineer over on the barge to see if they could help the captain get the pump going, but they could do nothing with it, and the master of the Overbrook then told

the captain of the barge "You had better go uptown and get somebody to do something with your pump."

The captain of the barge repaired his pump and asked to be taken in the tow, but as she was still leaking they would not take her.

The captain of the barge then telephoned Mr. Hickey, who represented O'Boyle, and told him the barge was on the mud and that he was going to quit his job. Another captain, by the name of Lenz, was sent down arriving at the barge on the morning of December 27th, whereupon the first barge captain left. At that time the Maurice R. was still on the mud, but with 13 inches of water in her and the pump had the leak under control.

On the morning of December 28th the respondent's steamtug Radnor shifted the Maurice R. from the mud where she was afloat to pier A where the loaded tows were made up.

When the order to place the Maurice R. in the tow was received by the master of the Radnor, he was informed by the captain of the Maurice R. that she was not leaking and had no water in her. The barge looked all right to the master of the Radnor, and she had about 10 inches of freeboard, which was enough for safety, and he placed her in the middle of the head tier of the loaded tow. The Maurice R. was later shifted to starboard boat third tier which was a safer position in the tow.

The respondent's steamtug Baltimore left South Amboy about 5 o'clock p. m. with the Maurice R. and other barges in tow bound for New York. The wind was light N. W. and there was no unusual weather or swells on the up trip, but at one time while coming up the bay, the captain of the Maurice R., the pump of which barge was going, came to the captain of the PRR 704, the starboard hawser boat of the tow, and told him that he was listing to port, and he went back with the captain of the Maurice R. and tried to shovel the coal and straighten him up.

When the tow arrived at the respondent's stakeboat before daylight on December 29th, the boats, including the Maurice R., were moored at the stakeboat, and the captain of the Maurice R. again came to the captain of the PRR 704 and told him he was leaking. The pumps of the Maurice R. were going, and the captain of the Maurice R. asked the captain of the PRR 704 to give him a hand to shovel more coal, and they tried to straighten the Maurice R. up again.

The tow had come up in charge of the steamtug Baltimore, which had been assisted by the Overbrook from Carteret.

The pump of the Maurice R. had been running all night.

Later the respondent's steamtug Mercer, which after leaving St. George had orders to land the North River boats out of a loaded tow lying at the stakeboat, arrived at the stakeboat and noticed the Maurice R. lying on the starboard side of the tow looking as if she was about to sink.

The master of the Mercer, about 9 o'clock a. m., had a short conversation with the captain of the Maurice R., and the Mercer made the Maurice R. fast with the port side of the Maurice R. to the starboard side of the Mercer and seeing that the Mercer would not be able to hold the barge, the Mercer had the respondent's steamtug Baltimore get on the starboard side of the Maurice R. and shove her onto the mud in a slip at Port Liberty, where the captain of the Maurice R. was put ashore to notify the owner, and she filled up, turned over, and damaged the cargo.

The Mercer stood by the barge until the tide fell and she settled herself in the mud, to put a line on her, but could not as all the bitts were submerged. The Mercer could do no more.

The gasoline pump of the Maurice R. was going when the Mercer made fast.

The Mercer had to work fast. She could have aided the Maurice R. if she could have put a siphon in her at once, but the captain of the Maurice R. told the master of the Mercer that there was no way to put a siphon in the Maurice R.

From the facts as found, the barge Maurice R. is solely at fault.

■ There is no evidence of any contract made by the owner or charterer with the respondent Pennsylvania Railroad Company to tow the barge Maurice R. to South Amboy and return to New York after being loaded.

This is clearly shown by the fact that the Maurice R. might have laid at South Amboy indefinitely if a new towage contract had not been entered into for towing the Maurice R. to her destination, to. wit, the written order of the libelant mailed to respondent on December 24, 1932.

It therefore seems to me that the respondent Pennsylvania Railroad Company was not a bailee.

The William Guinan Howard (C. C. A.) 252 F. 85, in which the agreement as found by the court was for the round trip from

New York to South Amboy and return, including any and all waiting at the latter place, and Doherty v. Pennsylvania R. Co. (C. C. A.) 269 F. 959, in which the court held that the Pennsylvania Railroad Company undertook to tow the barges Frances Doherty and Hercules to South Amboy, put the railroad company coal in the boats and send them back automatically to New York, are not in point.

The most that can be held with reference to the taking of the Maurice R. to South Amboy by the respondent's steamtug Baltimore is that it was a mere towage contract, under which the tug was not the bailee of the Maurice R. nor of her cargo. Stevens v. The White City, 285 U. S. 195, 52 S. Ct. 347, 76 L. Ed. 699.

When the steamtug Baltimore landed the barge Maurice R. at the mooring rack on the morning of December 24th, the relationship of the tug and tow ended. The Eastchester (C. C. A.) 20 F.(2d) 357; Schoonmaker-Conners Co., Inc., v. New York Tidewater Gravel Corporation (C. C. A.) 11 F. (2d) 470; The Milton (C. C. A.) 235 F. 287; The Townsend (C. C. A.) 29 F.(2d) 491; The Willie (C. C. A.) 184 F. 279; The Alice (D. C.) 157 F. 984.

The Maurice R. sustained no damage while at the mooring rack. There was no mark on her and there was nothing that her captain saw on the 24th, 25th, or early morning of the 26th of December, before she was loaded, that indicated that she had any damage from pounding. The only thing that made him think that she was damaged by pounding was the fact that she leaked after she was loaded.

The contention of the claimant of the Maurice R. that she was damaged by pounding while she lay at South Amboy, at the time in question, seems to be based on the erroneous belief that during those days she was moored at the "freight pier" instead of at the "mooring rack."

The allegation in the answer of the claimant of the Maurice R. as to the pier at which she was moored described the freight pier which had railroad tracks on it, running out to the end of it. From the testimony of the captain it is clear that the barge was moored at the mooring rack, which is the double row of piles extending along and about 25 feet off the South Amboy shore in a northwesterly direction, and pointed up toward the drawbridge rather than parallel with it.

The wind was from the Northwest during all the time the Maurice R. was at the mooring rack, and I am convinced that it is impossible for a boat to pound at the mooring rack, as the wind holds them off the rack. Wind alone will not make the boats pound, there must be a choppy sea, and while a Northwest wind sweeps down the Raritan river and hits the upper end of the mooring rack, there is not sufficient water surface for a sea to build up. With an East or Southeast wind the condition is different, as there is a wide sweep of water out to Sandy Hook, which allows a considerable sea to make up and strike the boats.

The evidence is overwhelming that the capacity of the Maurice R. should not have been exceeded by the loading on her of 881 tons of coal, and that she should have safely carried a much larger load. Her captain considered it a proper load and made no objection to the size of the load or the manner of loading.

There is no evidence that the Maurice R. sustained any damage on the trip from South Amboy to New York. She was examined by libelant's expert after she sank, for the purpose of determining the cause of her sinking, and he did not find any evidence of contact or collision.

On the morning of December 28th, before the Maurice R. was shifted from off the mud down to the loaded tow, she was then afloat and her master told the captain of the shifting tug that she was not leaking and had no water in her. She looked all right and had probably 10 inches of freeboard.

At 9 o'clock a. m. December 29th, the Maurice R. had considerable water in her and sank shortly after being taken out of the tow.

During all of the time between the time the Maurice R. was shifted from the mud to the tow on December 28th, until just before she sank on December 29th, her captain had been on board continuously and the barge had not encountered any rough water, swells, or wind, nor is there any evidence that he had requested any assistance from the tug having charge of the tow.

The conclusion is inescapable that the barge captain, who was the servant of the owner, neglected to take the necessary steps to keep his boat afloat, and by that I do not mean the taking of steps at the time he found her sinking. The Cary Brick Co. No. 8 (D. C.) 34 F.(2d) 981; New York & New Jersey Transp. Co. v. Cornell Steamboat Co. (C. C. A.) 180 F. 107; Dailey v. Carroll (C. C. A.) 248 F. 466; The Dauntless (C.

C. A.) 179 F. 346; Dittmar v. Sargent (C. C. A.) 277 F. 237.

That the barge was leaking and that her pump was unreliable was known to her owner as early as the afternoon of December 26th. McLaughlin, a representative of the owner, went to South Amboy and was on board the barge on the mud on the morning of December 27th. He was not called as a witness, and there is no evidence that any effective effort was made to stop the leaks although the claimant had full knowledge of them.

While the captain of the boat did take steps to put the pump in condition, there is no evidence that the owner did anything to assure the barge's seaworthiness before her captain, on the morning of December 28th, reported to respondent's tugmaster that she was dry and not leaking and ready to be towed.

■ If the sinking of the barge was not due to the negligence of the barge captain or the owner, it was unexplained, and an unexplained sinking raises a presumption of unseaworthiness. The Jungshoved (C. C. A.) 290 F. 733; Dupont de Nemours v. Vance, 19 How. 162, 15 L. Ed. 584; The Kathryn B. Guinan (C. C. A.) 176 F. 301; The Harper No. 145 (C. C. A.) 42 F.(2d) 161, certiorari denied, Ex parte Harper, 282 U. S. 805, 51 S. Ct. 100, 75 L. Ed. 723; The Adah (D. C.) 245 F. 378, affirmed (C. C. A.) 258 F. 377; The John E. Berwind (C. C. A.) 270 F. 569; The Buffalo (C. C. A.) 56 F.(2d) 738; Taylor Bros. Lumber Co. v. Sunset Lighterage Co. (C. C. A.) 43 F.(2d) 700; The Willie (C. C. A.) 231 F. 865.

The owner offered no convincing evidence to rebut that presumption.

■ It does not seem to me that the respondent Pennsylvania Railroad Company failed to exercise care when it took the barge in tow on December 28th, after her captain reported her dry and not leaking, and she was afloat and had about 10 inches freeboard, even though the respondent had taken her out of the tow and put her on the mud on December 26th, when it was discovered that she was leaking. It is common for upper seams of boats to be dried out, due to not having been recently submerged, and to leak through those seams upon receiving a full load, and for the planks to swell and close the leak after a few hours submersion. There was therefore nothing unusual or unexpected in the reporting by the representative of the claimant that the barge was ready to be towed after she had been two days on the mud.

■ The respondent was entitled to rely upon the barge captain's representation that the boat was in proper condition to be towed to New York. Southgate v. Eastern Transp. Co. (C. C. A.) 21 F.(2d) 47; The Edmund L. Levy (C. C. A.) 128 F. 683; Dameron-White Co. v. Angola Transfer Co. (C. C. A.) 19 F.(2d) 12; Sturgis v. Boyer, 24 How. 110, 122, 16 L. Ed. 591; The Lizzie M. Walker (C. C. A.) 3 F.(2d) 921.

Though the witness Savage, captain of another boat in the tow, said that the gasoline pump of the Maurice R. was running and she was listing, there was no evidence that she was in any danger, or that any notice thereof was given to the tug; in fact, the Maurice R. was not even in any trouble until she was out in the Bay, and then she was attended to and no notice was given to the tug in charge.

The first time that there is any evidence that the Maurice R. was in danger of sinking was at 9 o'clock a. m. on December 29th, when she was at the stakeboat and her captain asked the respondent's tug Mercer to take her out and put her on the mud, and this was the first time those in charge of the tugs knew that the barge was in trouble. The evidence is that her freeboard then appeared to be the same as when she left South Amboy, and the only difference in her condition was that she had a little list.

■ Some point was made of the failure of the Mercer to put a siphon into the barge, but we must not lose sight of the fact that the barge was in deep water and quick action was required, as is shown by the fact that although the tug proceeded at full speed, the barge filled and sank as soon as she reached shallow water in a slip at Port Liberty. There was no negligence of the tug (New York & New Jersey T. Co. v. Cornell Steamboat Co., supra), and I see no fault on the part of the respondent in the master of the Mercer relying on the statement of the captain of the barge that there was no place to put a siphon in the boat.

There was necessity for quick action, and we must in determining this question endeavor to put ourself in the place of the master of the tug and not decide it upon knowledge that came after the event, and in so doing I doubt even that an error of judgment was shown, and certainly no negligence on the part of the master of the tug was shown. The Harold (D. C.) 287 F. 757; The Eli B. Conine (C. C. A.) 233 F. 987; The Clarence L. Blakeslee (C. C. A.) 243 F. 365; The Lizzie D. Shaw (C. C. A.) 47 F.(2d) 820.

There was no negligence on the part of the respondent, its agents, or servants in shifting the Maurice R. from the hawser tier of the tow to the position of starboard boat in the third tier in making up the tow. Respondent knew that the barge had been on the mud and took her from a more dangerous to the safest place for her.

Barges which do not have ample freeboard forward should not be placed in the head tier. The Niagara (D. C.) 20 F. 152.

The burden of proving negligence rests upon the party alleging it. Stevens v. The White City, supra; The Lady Wimett (D. C.) 92 F. 399, affirmed (C. C. A.) 99 F. 1004; Aldrich v. Pennsylvania R. Co. (C. C. A.) 255 F. 330; The Winnie (C. C. A.) 149 F. 725; The R. B. Little (C. C. A.) 215 F. 87.

There cannot be two proximate causes for an accident. The Sunnyside (C. C. A.) 251 F. 271; The Red Eagle (C. C. A.) 3 F.(2d) 541.

The proximate cause of the sinking of the Maurice R. was the negligence of the claimant in failing to make her seaworthy before ordering respondent to tow her to New York, and the negligence of those for whose actions she was responsible.

That libelant was the charterer of said barge Maurice R., which was under the care and control of a master appointed and paid by the owner of said barge, for whose actions the said barge was responsible, and that the libelant's cargo was legally and lawfully on said barge.

I find as conclusions of law:

That the barge Maurice R. was unseaworthy when the respondent Pennsylvania Railroad Company was ordered to tow her to New York, and that solely because of her unseaworthiness and the negligence of those for whose actions she is responsible, she sank and the libelant suffered damage to its cargo laden thereon, for which said barge Maurice R. is solely to blame.

That neither the libelant nor the respondent Pennsylvania Railroad Company, nor any one for whose actions they or either of them are responsible, negligently or in any way caused or contributed to the damage to said libelant's cargo, and that they are wholly without fault.

That the libelant is entitled to a decree against the said barge Maurice R. for its damages, with interest and costs and the usual order of reference, and the respondent Pennsylvania Railroad Company to a dismissal of the libel with costs against the libelant.

Settle decree on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.