**THE BENNING.**

**THE ATLAS.**

**UNITED STATES v. WOOD TOWING CORPORATION.**

No. 6588.

District Court, E. D. Virginia, Norfolk Division.

April 21, 1942.

J. Frank Staley, Sp. Asst. to Atty. Gen., and Russell T. Bradford, Asst. U. S. Atty., of Norfolk, Va., for United States.

John W. Oast, Jr., of Norfolk, Va., for Wood Towing Corporation and Tug Atlas.

WYCHE, District Judge.

In this case the United States of America, as owner of the derrick boat Benning, has filed a libel in admiralty against the Wood Towing Corporation in personam and its tug Atlas in rem, in which they assert a claim for damages resulting from the foundering of the Benning at about 2:30 o'clock a. m., on December 8, 1939, while in tow of the tug Atlas, at a point northwesterly of Smith Point Lighthouse and near Buoy C-1. A claim for the loss of the personal effects of the crew of the eight men on board the Benning is also asserted.

The facts are substantially as follows: In November, 1939, the plant engineer in charge of the floating plants and their operation for the Washington, D. C., District of the United States engineers, telephoned from Washington, D. C., to the superintendent of the Wood Towing Corporation at Norfolk, Virginia, and arranged for the towing of the derrick boat Benning and the Steel Barge No. 4 from Washington, D. C., "to the mouth of the Little Wicomico River, Va." It was agreed upon the telephone that the United States engineers' launch Belvoir would accompany the tug and tow, and on arrival would tow the derrick and barge through the shoal watersand into the river where, because of her 11' draft the Atlas could not go.

The tug Atlas is a steel hull tug, 92.3' long, 10.3' beam and 10.2' in depth, with a Diesel engine of 575 indicated horse power.

The derrick boat Benning is a rudderless steel hull 82' long, 29.4' wide and 5' deep. She is equipped with an "A" frame, which supports a boom that is hinged at the base. When the boom is lowered, the base of its frame passes through an opening in the deck over which a steel cover was fitted, and which required caulking to make it watertight. The house behind the frame had a 2 x 4' eight-light window facing forward.

The Steel Barge No. 4, is a rudderless flush-deck steel hull 80' long, 26' in beam and 6' deep.

The launch Belvoir is a steel hull launch which is 40' in length, 10' in beam and has a draft of 3', and a Fairbanks-Morse Diesel engine variously estimated at from 60 to 85 horse power.

The Atlas left Washington, D. C., about 8:45 o'clock a. m., on December 7, 1939, with the Steel Barge No. 4 following the tug on a line about 360' long, and the derrick boat Benning following the barge on two lines about 30' in length, each of which led from a corner of the Benning to the opposite corner of the barge. The launch Belvoir followed on a line attached to the stern of the Benning.

As the tug and tow proceeded down the Potomac River, there was a moderate wind from the southwest until about midnight, when it shifted to the west, and in the following two and a half hours shifted to the north and northwest with gradually increasing force.

At about 12:45 a. m., on December 8, 1939, when the tug and tow were about five miles from the mouth of Little Wicomico River, which is formed by the jetties extending out into shoals of about three feet depth with lights on the outer end, the Atlas blew for the launch to take the tow into the river. The launch was slow in responding, and when the tug and tow were about three and a half miles from the jetties, Captain Jones, who was the master of the Benning, in charge of the equipment, boarded the Atlas from the launch Belvoir, of which one Green was the operator, and which lay moored to the starboard side of the Atlas, while Captain Jones went into the pilothouse of the tug and talked with Captain Casey of the Atlas who then pointed out to Captain Jones the lights on the jetties at the mouth of the Little Wicomico River, and explained to him that he then had a favorable and assisting wind and ebbing tide.

Captain Jones refused to let the launch take the tow into the river, and assigned as

the reason for his refusal that the weather was too bad, and he could not find his way in the night. Captain Jones then returned to the Benning in the launch and Captain Casey talked over the tug's radio telephone with the superintendent of his company and told him the launch would not take the tow into the river as the superintendent had told him it would, and that as the launch would not work, he would have to take the tow to Coan River, the nearest harbor. The superintendent told Captain Casey to do that and the tug then blew for the return of Captain Jones to the Atlas, and when he was again on the tug, Captain Casey again urged him to let the launch take the tow to the river with Mate Knowlton of the Atlas, as pilot. Captain Jones persisted in his refusal, and was then given a new line to replace a stranding line, and Captain Jones was told while the tug and tow were slowed down, to lengthen his derrick boat lines to 75', and send word by the launch when that had been done, and that the tug and tow would turn from a southeasterly heading to a northwesterly heading up the Potomac River for harbor as best she could. When Captain Jones sent back word by the launch that he was ready they started to make the turn. The wind, however, continued to increase in force from the northwest and while the tug and tow were "hove to" on a northwesterly heading, the Derrick foundered.

The libel in substance charges that the Atlas was negligent in that she turned around and put head of tug and tow to the sea; did not continue bound down the open waters with the following wind and sea; and failed to consider the approaching storm and take precautions.

It was urged at the trial that the point at which the Atlas ordered the launch to take the tow into the river was not the point contemplated by the libellant, but was a point in behind Smith Point Lighthouse at a mooring immediately south of the jetties at the mouth of Little Wicomico River, that had been used by barges which carried stone from Baltimore during the construction of the jetties.

The Wood Towing Corporation filed exceptions to the libel on the grounds that certain of its allegations were surplusage, and that, on the facts averred, the libel was insufficient in law, because the towage contract set forth in the libel was by its own terms shown to have been efficiently and completely performed.

There may be merit in the exceptions as to surplusage, but in view of the conclusion I have reached in this case, I do not think that is of any importance. I overrule the exception that the libel does not set forth a cause of negligent towage. The Quickstep, 9 Wall. 665, 76 U.S. 665, 19 L. Ed. 767.

Upon these facts the first two questions presented, are whether the tug and tow should have passed Coan River, and at what point it was intended that the tug should order the launch to take the tow into the Little Wicomico River.

The tug and tow passed Coan River about 11:20 o'clock p. m., on December 7th, and as the water was then smooth, and the wind was moderate from the west, and there was a slow falling barometer, I do not think there was anything in the situation which would justify criticism of Captain Casey's judgment in proceeding on for about one hour for a distance of about seven and a half miles at which he intended to deliver the tow to the launch. That point was between five and three miles off the mouth of Little Wicomico River. The tide was then ebbing, and he expected the wind to shift to the north and northwest with a gradual increase, but expected no bad weather before the launch could easily place the tow inside the river, which he regarded as his destination, and which was then only seven and a half miles distant. Later events proved this judgment to be correct, because the heaviest weather did not set in until about three hours later. If the tug and tow had had to go to the point of delivery south of the jetties at Smith Point and west of Smith Point Lighthouse, Captain Casey would have been confronted with an entirely different situation. But in my view of the matter, and certainly in Captain Casey's perspective, the only point of delivery of the tow to the launch was off the jetties at Little Wicomico River, and with the favorable conditions then existing, there was no reason why the launch should not have obeyed the tugmaster's orders. I agree with claimant-respondent that the contract required delivery to the launch when it arrived between five and two and a half miles off the jetties at the mouth of Little Wicomico River and ordered the launch Belvoir to continue on with the two across the shoals and into the river. It would be a strange act for the tug and tow to have gone outside of and around Smith Point Lighthouse, or have at-

tempted to pass to the west of and inshore of Smith Point Lighthouse in order to reach the point of delivery as claimed by the libellant. It would be most unusual to go past a destination in order to arrive. Neither of the parties had any previous experience in the towage and delivery of such a tow bound from Washington, D. C., "to the mouth of the Wicomico River". The fact that the point of delivery as urged by the libellant was an old mooring for barges that had delivered stone for the construction of the jetties at Little Wicomico River, I do not consider as significant. That was a lay-up berth outside of the river, and in this case it was clearly intended that the equipment should be promptly carried into the river by the launch, on towage in the waters in which the tug could not navigate. If the point of delivery had been as urged by the libellant, it would be expected that Captain Jones, the libellant's representative in charge of the equipment, would have been so informed, and would have requested Captain Casey to have gone there, but he did not mention it during his talks with Captain Casey. Furthermore, Green, the launch man, in his testimony under oath before the steamboat inspectors, prior to the filing of the libel in this case, testified: "My orders was when the tug got to the jetties off the mouth of the Little Wicomico, to hook on to her and carry her in there if the weather was favorable." The refusal of Captain Jones to obey the tugmaster was, in my opinion, the proximate cause of the disaster.

In the case of The Fort George, 2 Cir., 183 F. 731, 732, it is well said: "* * * The rule thus enunciated imposes too severe obligations upon the tow and makes her responsible for the failure to perform duties which the law places upon the tug. It is obvious that the expedition down the river could not have been taken under the joint command of the masters of the tug and the pilot of the barque. There can be no divided responsibility in such cases. Conference, discussion and agreement as to what course to pursue when danger threatens, between two vessels separated by a 70-fathom hawser, is out of the question. Some one must be in command. We understand the rule to be, in the absence of an agreement to the contrary, that when the tug supplies the motive power she becomes the dominant mind, and the tow is required to follow directions from the tug. An absurd situation would have been created had the pilot of the barque attempted to guide the tug down the winding channel of the Delaware river to the breakwater. It is probable that no sane tug master would accept a service so commanded, but if he had done so, it is more than likely that disaster would have occurred much sooner than it did."

Captain Jones and Green told Captain Casey they were ordered by their superiors not to use the launch to tow the equipment into the river if the weather was not favorable. Neither Captain Casey nor his owner had any notice that the use of the launch was to depend upon Captain Jones' judgment of the weather. In the absence of an agreement on behalf of the Wood Towing Corporation that their tugmaster would be subordinate to Captain Jones, it was Captain Jones' duty to obey the tugmaster. The foundering of the Benning is an illustration of the results of divided authority. Libellant having caused Captain Jones to breach the tow's duty can not complain about the results of that disobedience. The "Major and Minor Fault" Rule is applicable here. The Bright, 4 Cir., 124 F.2d 45.

The libellant urges that the talks of Captain Casey over the tug's radio telephone with his owner's superintendent, Captain Crank, after Captain Jones refused duty with the launch, establishes the fact that the conduct of the tug thereafter was exclusively pursuant to the judgment of the superintendent. Consultation and discussion, even in the highest places, does not mean an abandonment of authority or a disposition to evade responsibility. When Captain Jones refused duty with the launch, it was quite a natural act for Captain Casey to tell the fact to the man who had told him he could rely upon the launch, and Captain Casey's statement to Captain Jones and to the steamboat inspectors that Crank had told him to go back to Coan River has no more significance than a statement of the fact that he had talked with Crank and that they were in agreement.

The tug can not be blamed for the wind which reached a peak of about 34 miles per hour at about 2:30 o'clock a. m., and gave the Benning a washing she was not prepared to withstand. She might have been made watertight, but no such washing as she did receive was contemplated. If any one is to blame for the opening which allowed the water to enter, it is the people on the Benning who did not caulk and make her as watertight as they should. Southgate v. Eastern Transp. Co., 4 Cir., 21 F.2d 47; The

Marie, 1941 A.M.C. 1508; The Maurice R., D.C., 3 F.Supp. 86; The Sea Lion, D.C., 12 F.2d 124; Dady v. Bacon, 2 Cir., 149 F. 401; The Edmund L. Levy, 2 Cir., 128 F. 683.

Finally, the libellant insists that instead of making the turn to the northwest heading the tug and tow should have gone either around and outside of Smith Point Lighthouse, or passed inside, and to the westward of it to the aforementioned point which libellant insists was the point at which the tow should have been delivered to the launch. The waters off Smith Point Lighthouse, under weather conditions as prevailed on this occasion, are the roughest in Chesapeake Bay. There is no dispute about the fact that had the tug desired to go outside of and around Smith Point Lighthouse, it would have had to make the same turn that it did make to heave to on a northwesterly course, and then again another turn to a southeasterly course. Captain Casey said it never occurred to him for a moment to attempt anything like that, and is confirmed in that position by the libellant's expert, Wainwright. Even more impracticable is libellant's contention that this rudderless tow could pass to the westward of Smith Point Lighthouse and within its Red Sector. The Red Sector is there to warn vessels from entering those waters, and there is no contradiction of the testimony of Moon, McGuion and McMann, who were raised and lived and worked around the waters of Smith Point, that the waters to the west of Smith Point Lighthouse are full of lumps, and have no buoys or other aids to navigation, and are not used by tugs and tows. Gray, a disinterested witness, who very favorably impressed me, said that in his sixteen years' experience of service at Smith Point Lighthouse, he had never seen a tug and tow pass to the westward of the Lighthouse.

The unfortunate foundering of the Benning raises no presumption against the tug and her owner. They owed to the libellant and performed the duty of using the reasonable and ordinary care that might be expected of an expert tower. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; Southgate v. Eastern Transp. Co., 4 Cir., 21 F.2d 47; The Bellatrix, 1939 A.M.C. 663, 666; The Eastern, 2 Cir., 280 F. 711; The M. M. O'Brien, D.C., 60 F.2d 976; The Perseverance, D.C., 49 F.2d 785.

It follows that the libel must be dismissed. Pursuant to Admiralty Rule 46½, 28 U.S.C.A. following section 723, I am filing findings of fact and conclusions of law, and proctor for claimant-respondent may prepare and submit a final decree in accordance herewith.