## DADY v. BACON.

(Circuit Court of Appeals, Second Circuit. December 4, 1906.)

No. 45.

TOWAGE—SINKING OF TOW—LIABILITY OF TOWING VESSEL.

A steamship *held* not in fault for the sinking of a barge which she was towing on one of her regular trips from New York to Cuba, because of her keeping up her regular speed until the barge was found to be in distress, where the weather was fair, and the sinking resulted from the unseaworthiness of the barge for such a voyage due to her age and structural weakness, which condition was not known to the master of the steamship nor apparent; he having the right to rely on the assumption that her owner considered her fit for the voyage when he contracted for the towage, knowing that the steamship was required to make schedule time.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Towage, §§ 11, 24, 25.]

Appeal from the District Court of the United States for the Southern District of New York.

For opinion below see 133 Fed. 986.

This cause comes here upon cross-appeals from a decree of the District Court, Southern District of New York, holding the respondent, who was operating the S. S. Vimeira under a time charter, liable for one-half the damages sustained by libelant by reason of the sinking and total loss of his barge James L. Ogden and her cargo.

Peter S. Carter, for libelant.
C. S. Haight, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The steamship with the barge in tow on a hawser, started from New York about 4 a. m. on June 3, 1902, bound for Cardenas, Cuba, and laid her course for Cape Hatteras. The following excerpt from the opinion of the district judge accurately sets forth the circumstances attending the sinking:

"The weather was fine [at the start] and continued so until the end. The steamship's usual speed was from 8 to 9 knots. During the day she made about 7 knots. Up to about 8 o'clock p. m. so far as the steamship was advised nothing unusual occurred on the barge, although she was sheering

badly owing. to her lack. of a rudder, but at that time a signal was displayed to the steamship asking her to proceed slowly. The steamship complied with the request and during the night went at the rate of about 2 knots. There is a conflict between the witnesses from the. barge as to her condition at this time, one of three men on board testifying that there were then two feet of water in the hold, and another that the barge was not then leaking seriously. I am inclined to believe the former. There is no dispute between the two witnesses, who have been examined of those on board, that after the signal she leaked badly. During the night, one of her two pumps became choked and useless. By pumping all night with the other she was kept afloat, but when day broke on the morning of the fourth a sign was displayed on the barge, that she would not float more than two or three hours and the men were then taken off by a boat from the steamship. At this time the tow was opposite a point on the coast about half way between the Delaware and Chesapeake Bays. The master of the steamship so estimated, and that they were then about 50 miles from the coast and about 90 miles from Cape Henry. Under the circumstances, he did not feel bound to deviate from his course, especially as the appearance of the barge indicated that it was not probable she would last much longer, though in fact she did not sink for 8 or 10 hours. If that could have been known at the time, it does not seem that it would have made much difference, as it is doubtful if in view of her position, she could have been saved in any event. Her distance from the coast and the nearest point of refuge was such that going at the slow rate of speed she was obliged to use under the circumstances, she was practically without reasonable hope of reaching harbor, after she became partially filled with water."

The barge was an old one, built in 1864, and although she had been repaired and was no doubt fit for ordinary towing, she was in no condition structurally to withstand the strain of a long sea voyage, without a rudder, in tow of a steamship of a regular line, which was running on schedule time and had to keep up to a speed of 7 knots in order not to fall behind it, or incur liability for delay to the shippers of her cargo. She was, as the District Judge found, unseaworthy in the sense of not being in a fit condition to tow safely on the voyage which she entered upon.

The claim made in the libel, and on which libelant relied upon the trial was that there was a special contract that instead of laying the usual and direct course for Cardenas the steamship would keep along the coast, so as to be within 10 or 15 miles of shore and therefore, in a case of disaster much nearer to a port of refuge than she would be on her regular course and to tow at a lower rate of speed. On the argument, it was further contended that, even without a special contract, she should have followed the coast line as a safer course with a barge in tow. There was a sharp conflict of testimony as to what took place when the contract was made; on the part of the libelant evidence was put in tending to show such a contract; on the part of the respondent there was proof that such a contract was asked for but that it was refused, that libelant's agent was told the Vimeira would not follow the coast, and that her speed would not be reduced because she was running on a regular line, and because the sum offered for towing the barge was not sufficient to warrant her going at any less speed than ordinary—8½ to 9 knots. The District Judge heard and saw the witnesses, and found against the libelant on this branch of the case. He says:

"If the contract was as contended for by the libelant, the respondent would have incurred a liability for expenses considerably in excess of the towage returns. The improbability of such a contract being made in connection with the testimony satisfies me that the respondent's version of what occurred between the parties should be accepted."

We fully concur in this conclusion. The libelant, therefore, took the chances as he had the right to do if he so elected, of whatever increased risk there was in towing 40 or 50 miles from the coast at the speed which the Vimeira maintained, until advised of disaster, viz., 7 knots.

The District Judge held the respondent in fault because, although not advised of the structural unseaworthiness of the barge, the master of the Vimeira nevertheless could see enough about her to inform him that she was not in fit condition to tow at that rate of speed, and should therefore have reduced it. Two circumstances are relied upon:

(1) Her freeboard. There is some dispute as to what this was; one witness says 2 feet amidships and 4 to 4½ feet at the bow, another makes it between 5 and 6 feet at the bow and a foot and a half less aft. Moreover there was a bulkhead built across the bow to throw the water off when it struck her. Whatever was her actual freeboard it was amply sufficient for towing at 7 knots down to the time when signal was made and the speed reduced. The weather was fine and during her course down to the time when she was found to be making water—as the respondent's own witness testified "she rode beautifully in the sea * * * there was no washing at all over her, she acted beautiful that way." There seems to have been nothing in her freeboard to call for reduction of speed during that period.

(2) The absence of a rudder. Before starting the respondent had her rudder removed, apparently because it would be difficult to handle it in a heavy sea. In consequence, it was apparent that she would continually sheer from side to side and thus be exposed to greater strain. Because she had no rudder, the pilot who took the Vimeira down through the harbor refused to tow her, and she was brought down to the Lightship by a tug. That, however, was because of the damage she might do to other craft which would have to be encountered in a crowded harbor. In the open ocean with plenty of sea room the situation would be different. She was not heavily laden and we do not find sufficient in the evidence to warrant the conclusion that a sound, well-built craft might not be expected to withstand the added strain of towing without a rudder without incurring any particular risk. She was not in fact sufficiently sound in structure to stand that strain, but there was nothing in her appearance to convey that information to the master of the steamer, who knew she was turned over to him to tow through the open ocean at his ordinary speed. He was entitled to rely on the assumption that her owner, who knew her internal structure and condition, considered her fit to set out on such a voyage, and until something occurred to indicate that such assumption was unsound, was entitled to rely upon it. The Dis-

trict Judge, in our opinion, gave too much consideration to a remark of the master upon cross-examination that he considered "one knot was too great a speed to tow that barge." This is wisdom after the event, and manifestly an exaggerated form of expression epitomizing his general disgust at the complete break down which occurred without any untoward condition of wind or sea. He says that he did not think her "all right" to tow when she was given to him, but his testimony shows that what he meant was that he considered it a "very foolish idea" to tow without a rudder.

In our opinion, no fault is proved against the steamer. The decree is reversed, with costs, and cause remitted, with instructions to decree in accordance with this opinion.