DAMERON-WHITE CO., Limited, et al. v. ANGOLA TRANSFER CO. et al.

Circuit Court of Appeals, Fifth Circuit. May 5, 1927.

No. 4920.

1. Towage ⬳11(1)—Tug, though not insurer, must exercise ordinary care and display competent seamanship in handling tow; "common carrier."

Tug is not "common carrier," and not insurer, but bound to exercise ordinary care and display competent seamanship in handling tow.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Common Carrier.]

2. Towage ⬳12(1)—Tug is not responsible for accidents due to tow's unseaworthiness, unless such condition is disclosed, or so apparent that it is negligent to proceed.

Tug is not responsible for accidents occurring through unseaworthiness of tow for intended voyage, unless unseaworthy condition is disclosed, or so apparent that it would be negligent to attempt to proceed.

3. Towage ⬳15(2)—Sinking of barge held, under evidence, result of its unseaworthiness.

Sinking of barge in river *held* to be result of its unseaworthiness, rather than negligence or bad seamanship of tug, barring recovery, by owner of tow against owner of tug, in view of evidence.

Appeal from the District Court of the United States for the Eastern District of Louisiana; Louis H. Burns, Judge.

Libel by the Dameron-White Company, Limited, and the Louisiana Trust & Savings Bank of Baton Rouge, La. (née Thomas G. Erwin, receiver), against the Angola Transfer Company, owner of the steamer J. B. Lewis, and others. From a judgment dismissing the libel, libelants appeal. Affirmed.

John D. Grace, M. A. Grace, and Edwin H. Grace, all of New Orleans, La., for appellants.

R. C. Milling and Eugene D. Saunders, both of New Orleans, La. (Milling, Godchaux, Saal & Milling, of New Orleans, La., on the brief), for appellees.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

FOSTER, Circuit Judge. Appellant filed a libel to recover damages of upward of $22,000 for the loss of the barge Mary and her cargo, consisting of levee building machinery and equipment, alleged to have been caused by the negligence of the steamer J. B. Lewis, owned by appellee, in towing the barge. The District Court found in favor

of appellee and dismissed the libel, to reverse which judgment this appeal is prosecuted.

The allegation of negligence in the libel is substantially. this: That in towing the barge in the Mississippi river the Lewis ran at too high a rate of speed, and, as the tow came up around a point, it encountered a heavy current, against which no provision was made or care exercised by the officers and crew of the tug, with the result that the head of the barge buried, and water piled up over the head, resulting in the sinking of the barge, and further that the officers and crew of the tug failed to exercise ordinary seamanship and care in the navigation of the tug and barge. The answer denies negligence, alleges that the barge sank because of its unseaworthy condition, and further alleges that the agreement with regard to the machinery loaded on the barge was that it would be towed at owner's risk. The evidence is in considerable conflict on some points, but a clear preponderance tends to show with reasonable certainty the facts hereafter stated in the course of the opinion.

There was a verbal contract of towage entered into between White, representing appellant, owner of the barge and cargo, and Dippel, representing appellee, to tow the barge from a point in the Mississippi river near the mouth of Red river to Hard Times, near Natchez. The barge was towed light by the towboat Arthur from a coal fleet above Baton Rouge to Raccourci, a point on Old river, where it was loaded. After loading, it was taken out into the Mississippi by the Arthur and delivered to the Lewis in midstream. The tow was made up with the stern of the barge against the bow of the tug, which is the usual method of towing in the Mississippi river with craft of this kind. The tow proceeded up the east bank of the river for a few miles, the distance not being accurately disclosed by the record, in order to avoid sand bars along the west bank. Ahead of the tow on the east bank was a shoal bar, and in order to avoid it the tow crossed over towards the west bank and then straightened up and proceeded along the west bank. After going about a mile or so along the west bank, the barge suddenly sank and became, with its cargo, a total loss.

The Mary was an open barge, 90 feet long by 42 feet beam, and 6 feet in depth. It was built of heavy timbers, with straight sides, flat bottom, and square stern, with a cross-bulkhead forward. According to the allegations of the libel the bow consisted of a false rake, which formed no part of the hull, and served no purpose except to prevent water from piling up at the head of the barge when being towed. There is some testimony that the gunnels ran out to the end of the rake; but it hardly is convincing, and in view of the other testimony it is reasonably certain the rake was constructed as alleged. The rake was not watertight, and very shortly after the barge started began to fill up with water. White, who was a foreman employed by appellant, was on the barge, and informed King, captain of the tug, that water in the rake made no difference, as the bulkhead was tight and the water in the rake would run out of the sides, without entering the hull of the barge. There was very little water in the hull at this time, although there was a small leak in the forward bulkhead.

King testified that he started towing the barge at half speed, found that she would not tow safely at that rate, and reduced his speed to slow, but could not make progress or maintain steerage way at that rate. He then had the engineer graduate his speed to something between half and slow. The river was at an ordinary stage, with a current probably between 3 and 4 miles, and at this rate the tow was making between 2 and 3 miles against the current. King became apprehensive as to the safety of the barge, and decided he would stop at Angola, a few miles above where the accident occurred, to consult his superior, Dippel, as he did not believe the barge could stand the trip to Hard Times. He also testified that in his best judgment he could not land the barge anywhere before he got to Angola, because of the sand bars in the river and high wooded banks on either side, and that it would have been as dangerous, if not more dangerous, to have attempted either to back down to a landing, where he had received the barge, or to turn around and go there.

There was a comparatively straight reach of river from where the barge was taken in tow to where she sank. The testimony is conflicting as to the force of the current, but it is probable that it was a little stronger in the stretch after she crossed the river and straightened up; but there was not enough difference to materially increase the danger of navigation. The testimony of King and Barker, the master and the pilot, respectively, of the Lewis, is to the effect that, when the barge sank, the rake broke off and the forward bulkhead collapsed, so that the water rushed into the hull. There is other evidence to support this, and there is nothing to rebut it. It is shown that the barge had been laid up for at least 60 days before she was

loaded with the machinery, and that, when a vessel of this kind is laid up, the seams above the water line open up.

Appellant has endeavored to show that the barge was in good condition by producing Maikell, an insurance inspector, who inspected her about two years before the accident. This witness also testified that the barge was insured at the time she was sunk; but his evidence has no probative force on that point, as he was not then employed by the underwriters. He also testified that it was usual to inspect barges of this kind at least once a year; but there is nothing to show that this barge was in fact inspected within that time, nor is it shown that any repairs were made on her after her inspection two years before.

[1, 2] The law regarding towage is well settled. The tug is not a common carrier, and not an insurer, but is bound to exercise ordinary care and to display competent seamanship in the handling of the tow. The tug is not responsible for accidents occurring through the unseaworthiness of the tow for the intended voyage, unless her unseaworthy condition is disclosed, or is so apparent that it would be negligent of the tug to attempt to proceed.

[3] On the record before us, there could be no criticism of the seamanship of the captain and crew of the tug. The tug could not have proceeded at any slower speed under the circumstances, and was entitled to rely upon the barge being sufficiently seaworthy for the contemplated voyage under ordinary conditions. There was certainly no error in navigation in crossing the river and proceeding up the west bank, as it would have been an impossibility to go much further on the east bank, and there was no error of judgment on the part of the captain in deciding to proceed rather than to risk the danger of landing the barge or to turn about for that purpose. Further, it is probable that there was not sufficient difference in the force of the current at the time the barge sank to have caused the accident if she had been seaworthy. While some of the witnesses testify that it was immaterial whether the rake was watertight, there is other evidence that a rake of this sort is supposed to be watertight, and it is reasonable to suppose that, if it leaked, the weight of water accumulated in the rake would have the tendency to bury the head of the barge. Prior to the sinking, very little water had accumulated in the hull of the barge, not sufficient to cause apprehension on the part of any one on her or the officers of the tug.

On the whole case, we must conclude that no negligence or bad seamanship was shown on the part of the tug, and that the accident was caused by the unseaworthiness of the barge. Entertaining these views, it is unnecessary to pass upon the defense that the cargo was towed at owners' risk.

Affirmed.