**CHOCTAW TRANSPORTATION COMPANY In its Own Behalf as Owner of THE Barge NO. 9, Libelant,**

v.

**FORD CONSTRUCTION COMPANY and K. W. K. Towing Company, Respondents.**

**No. G–C–7–60.**

United States District Court
N. D. Mississippi,
Greenville Division.

May 4, 1961.

Brunini, Everett, Grantham & Quin, Vicksburg, Miss., for libelants.

Dent, Ward, Martin & Terry, Vicksburg, Miss., George Denegre, New Orleans, La., Teller, Biedenharn & Rogers, Vicksburg, Miss., for respondents.

CLAYTON, District Judge.

This is a libel in admiralty brought by Choctaw Transportation Company against Ford Construction Company and K. W. K. Towing Company for the value of a barge which buckled and sank in the Mississippi River on November 20, 1957. Choctaw, the owner of the barge, bottoms its claim on negligence in the loading and towing of the barge and on the failure of the charterer, Ford Construction Company, to return the barge in a good, sound and seaworthy condition. Ford Construction Company and K. W. K. Towing Company both deny liability for the loss and, in the alternative, K. W. K. seeks relief by a petition against Ford Construction Company under Admiralty Rule 56, 28 U.S.C.A., for a decree against Ford if the Court should find that Choctaw is entitled to a decree against K. W. K.

The parties entered a stipulation covering the facts surrounding the demise and use of the barge, its sinking and salvage, and testimony of witnesses was introduced to supplement this stipulation. At the conclusion of the testimony, the case was taken on briefs, and the Court now files its findings of fact and conclusions of law.

Choctaw was on September 9, 1957, the owner of the steel Barge No. 9, a vessel without motive power and built and used for the carriage of cargoes. The barge was built between the years 1930-1934. She was 160 feet long, 36 feet wide, and 7½ feet deep, and was equipped with three transverse bulkheads, one at the center and two at the rakes, and a longitudinal center bulkhead.

On September 9, 1957, the barge was demised to Ford under a bareboat charter in the form of a letter providing for charter hire of $25 per day. Shortly after September 9, 1957, the barge was delivered to Ford, accepted, and put into service.

The barge, from all outward appearances, was in reasonably serviceable condition for the purpose for which she was intended to be used by Ford, and although she had seen much hard use and wear from her 25 to 30 years of service on the River, she appeared to be suitable and satisfactory for the transportation of sand and equipment up to her capacity of approximately 800 tons.

This barge was used by Ford to transport sand and miscellaneous equipment and machinery without incident until November 20, 1957, making approximately 100 trips carrying cargoes averaging 400 tons. No repairs were performed on her by Ford while in its possession and no maintenance procedures were employed or required to maintain the barge in the condition which she was in when demised, ordinary wear and tear excepted.

On November 20, 1957, the barge was loaded at Goodrich Landing on the Mississippi River, with her load consisting of five caterpillar tractors, two empty 1000 gallon fuel tanks, a dump truck, and approximately 80 tons of sand and ten men. The load was evenly distributed about the deck, the barge having about the same draft at both ends. She drew 2½ feet after loading, with 4½ to 5 feet of freeboard and appeared to be in sound condition at the time the cargo was placed on board.

The motor vessel Templeton, owned by K. W. K. and under contract with Ford on an hourly rate basis to tow Ford's equipment as directed, was made up to the stern of the barge while thus laden and began towing the barge.

The Templeton, while pushing the barge upstream, was passed by a sternwheel steamer, also bound upstream. The passage of the steamer was to starboard in a routine manner. Her wake created waves and when they reached the barge she buckled amidship. Cables

between the Templeton and the barge were removed and she was pushed ashore where the equipment was unloaded and the barge abandoned.

Although the barge was later raised, refloated, repaired and returned to service, she was a total loss to her owner, Choctaw Transportation Company. The value of the barge on November 20, 1957, was $15,000.

■ Considering all of the evidence presented and the stipulation of the parties, a finding that the buckling of this barge was caused by its age, the gradual weakening of its framework and plates, and not by reason of any negligence on the part of either Ford or K. W. K. is compelled. Thus, the latent unseaworthiness of the barge, which could not reasonably have been known to either of the respondents, was the villain which caused her collapse like "The Wonderful One-Hoss Shay". A finding of fault or negligence on the part of Ford or K. W. K., or both of them, is not warranted in the circumstances presented for consideration by this Court.

■ Neither Ford nor K. W. K. were insurers of this barge, but both were obligated only to use reasonable care, which is what the evidence shows they did. This seems to be the teaching of all the cases.

With respect to K. W. K., the language used by the Court of Appeals for the Fifth Circuit in Dameron-White Company v. Angola Transfer Company, 19 F.2d 12, 14, seems peculiarly applicable. Speaking through Judge Foster, that Court, in exonerating the tower from liability, said:

"The law regarding towage is well settled. The tug is not a common carrier, and not an insurer, but is bound to exercise ordinary care and to display competent seamanship in the handling of the tow. The tug is not responsible for accidents occurring through the unseaworthiness of the tow for the intended voyage unless her unseaworthy condition is disclosed, or is so apparent that it would be negligent of the tug to attempt to proceed."

Here the barge was properly loaded with the weight of the load evenly distributed and there was nothing in her appearance to suggest the presence of the latent unseaworthy condition which caused her to sink. This ends the matter for K. W. K.

And so it does for Ford when the case of Richmond Sand & Gravel Corp. v. Tidewater Construction Corp., 4 Cir., 1948, 170 F.2d 392, 393, is considered. The facts in that case are quite similar to those in the case at bar. The scow Janet McGeeney sank while loaded with gravel. Libel was filed by the owner against the charterer and the Court of Appeals for the Fourth Circuit in affirming a denial of recovery in the District Court said, "He found that the capsizing of the McGeeney resulted from her own unseaworthy condition and dismissed Richmond's libel of Tidewater; * * *

"In its libel for the damages to the McGeeney, Richmond relies upon the familiar rule in the law of bailments that a prima facie presumption of negligence on the part of the bailee arises from the bailor's proof that the bailed article was delivered in good condition and was returned damaged, or not returned at all. (Citing cases.) Applying this principle, Richmond asserts that it is entitled to a verdict since it has proved that the McGeeney was in seaworthy state when delivered and that Tidewater has failed to explain how the disaster occurred. It is necessary that we consider briefly the effect of this presumption.

"The presumption does not—as suggested by Richmond—cast upon the bailee the ultimate burden of proving how the damage occurred. (Citing cases.) It is a rebuttable presumption whose sole effect is to shift to the bailee the burden of proceeding with the evidence. (Citing cases.) There are, in general,

two ways in which the bailee may rebut the presumption. He may show either how the disaster in fact occurred and that this was in no way attributable to his negligence, or that he exercised the requisite care in all that he did with respect to the bailed article so that, regardless of how the accident in fact transpired, it could not have been caused by any negligence on his part. (Citing cases.) The presumption is not evidence for the consideration of the jury * * *, and once rebutted in either of these fashions, disappears from the case. * * * It is thus solely a procedural device and does not in any way affect the ultimate burden of proving the bailee's negligence, which burden remains throughout with the plaintiff-bailor. (Citing cases.)

\* \* \* \* \* \*

"The bailee's position is further strengthened in cases such as this where the damage to the bailed article is such as might have resulted from a latent defect in the article itself rather than from the application of outside forces. In this situation, the bailee's proof that he exercised due care in all that he did with respect to the bailed article not only serves to rebut the presumption of negligence on his part but also tends to destroy the bailor's initial proof that the article was delivered in good condition. (Citing cases.) That is precisely what occurred in this case. After hearing all the evidence, the Trial Judge concluded that the capsizing of the McGeeney 'was due solely to her unseaworthiness.' This finding, which we think is amply supported by the evidence, along with the finding that no act or omission of Tidewater contributed to the unseaworthy condition of the scow, necessarily implies that, although floating and in apparently good condition when delivered to Tidewater, the scow was at that time actually unseaworthy. Having

failed to prove any specific act of negligence by Tidewater, Richmond must have its libel for the damages to the McGeeney dismissed. This portion of the judgment below is affirmed."

To paraphrase Holmes:

"Logic is logic. It had reached its time. This was the end of Barge No. 9".

The libel must be dismissed.

Order may be prepared for entry in accordance with this opinion.