OTTO CANDIES, INC.

v.

GREAT AMERICAN INSURANCE COMPANY.

No. Adm. 4237.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 30, 1963.

George B. Matthews, Lemle & Kelleher, New Orleans, La., for libelant.

J. Barbee Winston, James B. Kemp, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for respondent.

WEST, District Judge.

Libelant, Otto Candies, Inc., brings this libel seeking recovery of certain alleged

damages resulting from cargo loss and barge damage. Libelant, at the time of the loss in question, was a boat contractor who had chartered the Tug BETTY LOU from her owners, Ernest Moise and Harold Collins, and then entered into an agreement with Southeastern Drilling Corporation, who, at the time, was drilling an oil well in the Southeast Pass at the mouth of the Mississippi River for Humble Oil & Refining Company, to furnish the use of the BETTY LOU to it for use in its drilling operations. The captain of the Tug BETTY LOU was Norbert Bruce. He was employed as captain of the tug by Moise and Collins. Respondent, Great American Insurance Company, insured the BETTY LOU in the amount of $20,000, and by endorsement to the policy, libelant became an additional assured. The policy covered the type of loss here involved. On December 31, 1958, a loss occurred, both to cargo and to certain portions of the Barge HO&R 17, owned by Humble Oil & Refining Company, on which the cargo was stowed. A claim for damages in the amount of $11,928.66 was made by Humble against Southeastern, who in turn made claim against libelant for the same amount and at the same time, withheld monies owed by Southeastern to libelant in an amount approximately equal to the amount of Humble's claim. Libelant reported the loss and claims to respondent who took the position that the loss was not occasioned by any negligence on the part of the BETTY LOU or its crew, but at the same time assured the libelant that it would be protected under the policy and that it, respondent, would defend the claims made against libelant. Despite this assurance, libelant proceeded to settle the claim by paying the sum of $8,000 to Humble Oil & Refining Company, and in return therefor, obtained an assignment of Humble's claim. Libelant thus seeks to recover from respondent the amount paid by it in settlement of the claim, plus interest, penalty and attorney fees, on the grounds that the loss was occasioned by the negligence of the Tug

BETTY LOU, and that libelant is (1) an assured under the policy, and (2) the assignee of Humble's claim. It is the position of respondent that first of all, the loss was not caused by any negligence on the part of the BETTY LOU or its crew, and secondly, that since it had notified libelant that it, respondent, would defend the claim, and that in any event, respondent was fully covered by the policy, libelant had no right to settle the claim without the consent of respondent, but that on the contrary, libelant was obligated to fully cooperate with the respondent in the defense of the claim.

While this Court has some doubts as to the right of libelant, under the circumstances of this case, to recover from respondent either as an assured or an assignee of Humble, nevertheless, whether it has such a right or not is immaterial in view of the fact that this Court concludes that the loss sued for was not occasioned by any negligence on the part of the BETTY LOU or its crew. In connection with this conclusion, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### 1.

The Tug BETTY LOU was approximately 50 feet long, 17 or 18 feet wide, and about 6½ feet deep. She was powered by one 300 horsepower diesel engine, and was pilothouse controlled. The Barge HO&R 17 was a steel deck barge of conventional type, with rakes on each end, approximately 100 feet long, 30 feet wide, and 6 to 7 feet deep. On the deck of the barge was constructed a house for stowage of mud and chemicals. This house was 80 to 90 feet long, 20 feet wide, and 11 or 12 feet high, with a peaked roof. It was constructed by 2 x 4 risers or studding, enclosed with corrugated tin sheeting. The BETTY LOU was owned by Ernest Moise and Harold Collins, chartered to libelant, and furnished under contract by libelant to Southeastern Drilling Corporation to be used in connection with its oil drilling operations. The

Barge HO&R 17 was owned by Humble Oil & Refining Company, for whom Southeastern was drilling a well at the time of the loss in question.

**2.**

On December 31, 1958, Captain Bruce, of the BETTY LOU, was instructed by Southeastern Drilling Corporation to take the HO&R 17 in tow and to proceed with it from the well site near Garden Island in the Southeast Pass at the mouth of the Mississippi River to the Mayronne dock in Venice, Louisiana, where it was to be loaded with drilling mud and chemicals. He was further instructed that immediately upon the loading of the barge, he was to return it as soon as possible to the well site.

**3.**

In compliance with these orders, the BETTY LOU took the HO&R 17 in tow, and arrived at the Mayronne dock at Venice, Louisiana, at about 5:00 o'clock a. m. on December 31, 1958. Upon arriving at the Mayronne dock, the barge was spotted and loaded with sacks of drilling mud and chemicals. These materials were contained in 50 pound and 100 pound sacks, stacked on pallets, and were then loaded in the house on the deck of the HO&R 17 by men working on the dock. This cargo was owned by Humble, as was the Barge HO&R 17. The men who loaded the mud and chemicals on the barge were not working under the control or supervision of the captain or crew of the BETTY LOU, who had nothing whatsoever to do with the loading operation.

**4.**

The sacks of mud and chemicals were loaded from the deck to a height of about 11 feet inside the house, leaving only a 1 to 2 foot passageway from forward aft in the center of the barge. Thus, the cargo occupied the entire interior of the house on the deck of the barge, except for the space in the peak of the roof, and the narrow passageway along the center of the barge.

**5.**

After loading was completed, Captain Bruce went aboard the barge and checked all manholes and hatch covers to be sure they were watertight, and also checked and made sure that there was not list on the barge. He walked into the house and saw how the cargo was loaded. The sacks were not tied down, but he saw that they were loaded as hereinbefore described. He noted that the barge, at that time, had between 1 and 1½ feet of freeboard. While Captain Bruce did not know how many sacks were loaded on the barge, he did testify that there were approximatley 2,500 sacks of mud, not counting the sacks of chemicals.

**6.**

After ascertaining that the barge was apparently watertight, and that it was not listing to either side, he proceeded to make up to the barge by hipping the BETTY LOU up with her starboard side to the port side of the barge. The barge was made fast to the tug by the use of rope lines.

**7.**

As thus made up, the BETTY LOU, with her tow, left Venice, Louisiana, at about 5:00 o'clock p. m., December 31, 1958, entered the Mississippi River, and proceeded downstream at about 3 to 4 miles per hour. Captain Bruce made no weather checks upon leaving Venice, but the weather at the time of his departure was fair and clear.

**8.**

At about 6:00 o'clock p. m., that evening, while proceeding down river, a thick fog set in which rose from the water up above the wheel house of the BETTY LOU. Captain Bruce decided that it was dangerous to continue down river in such a heavy fog, and consequently decided to go to the bank with his tow. He turned to starboard and maneuvered the tug and its tow into the right descending bank of the river in such a way as to beach the front of the barge, keeping the barge at right

angles to the river bank. The bank in this area was clean and sloping, and was free of stumps and other obstructions. The head of the barge, when it came to rest, was resting on the bottom, about 40 to 50 feet from the actual shore line. Only about 5 feet of the front of the barge was actually aground. No mooring lines were put out, as there was no place to secure them. The barge was then held in this position by the BETTY LOU keeping her engines turning forward just enough to hold the barge in position on the beach. After the barge was thus beached, and it was obvious that its position could be maintained, the only deckhand aboard, Whitney Lambas, went to bed. Captain Bruce remained in the pilothouse tending the tug and her tow.

**9.**

The barge was thus held in position, and apparently remained on an even keel until about 11:30 o'clock p. m. During this entire time, Captain Bruce kept the tug's spotlight on the barge and kept a close watch on his tow. He saw no indication of listing and saw nothing to indicate that anything was amiss until 11:30 o'clock p. m. At that time, he suddenly noticed the HO&R 17 begin to list decidedly to starboard. He called for Lambas, who came out of the pilothouse where he had been sleeping, and together they quickly released the barge from the BETTY LOU. It was immediately apparent that if the barge capsized, unless the BETTY LOU was released, she would very probably be pulled over and under by the barge. The barge took a heavy list to starboard, and suddenly the starboard side of the house atop the barge broke out, allowing some of the cargo to fall out of the house and into the river. As soon as a portion of the cargo thus spilled overboard, the barge righted itself and Captain Bruce then immediately made the BETTY LOU up to the barge again. About that time a northwest wind came up and the fog cleared. The BETTY LOU then proceeded with the Barge HO&R 17 in tow, back to the Humble dock at Venice, Louisiana. The damage

resulting from this accident consisted of a loss of the cargo which spilled overboard, together with the damage to the starboard side of the deckhouse on the barge.

**10.**

Between 6:00 o'clock p. m. when the barge was nosed onto the bank and 11:30 o'clock p. m. when it suddenly listed to starboard, spilling some of its cargo, Captain Bruce had observed 5 or 6 seagoing vessels pass on the river, some going up river and some going down river. Due to the heavy fog, he could just barely see their range lights, but he believed them to be seagoing vessels. As each ship passed, a wave wash, which he estimated at 3 to 5 feet high, would result. This caused the tug and the HO&R 17 to rock. But Captain Bruce did not consider this condition unusual, and he specifically noted that the barge did not list at any time during the passage of these various vessels until the accident occurred at 11:30 o'clock p. m. The list came on and the cargo spilled in a matter of a very few minutes.

**11.**

The rocking of the barge as a result of the wave wash from vessels was no more violent than would be expected under normal circumstances while underway.

**12.**

Captain Bruce concluded that the list which occurred at 11:30 o'clock p. m. was the result of the cargo aboard the barge shifting too much to one side, and that this could have resulted from the rocking of the barge caused by the wave wash.

**13.**

■ The decision of Captain Bruce to put into the bank upon being engulfed in fog was thoroughly justified. To have continued underway in the fog might well have constituted negligence on his part.

**14.**

The method used by Captain Bruce to beach the HO&R 17 was in accordance with good and accepted procedures, and

libelant has failed to show any negligence whatsoever on the part of the BETTY LOU or its crew. The fact that another captain might have beached the barge at an angle to the bank rather than perpendicular to the bank is immaterial. The fact is that a preponderance of the evidence here shows that good judgment was used by Captain Bruce in beaching the barge as he did.

**15.**

The damage complained of here was caused by the unseaworthiness of the Barge HO&R 17 rather than by any neglect on the part of the BETTY LOU or its crew. Had the barge been properly loaded, this accident would not have occurred.

**16.**

There was, however, no evidence whatsoever in this case to show that at the time the tow was undertaken by Captain Bruce, the barge was apparently and manifestly unseaworthy. As a matter of fact, it seemed quite apparent, until just minutes before the accident occurred, that the barge was seaworthy and that it was properly loaded. During the trip from Venice to the point of beaching, and during the 5½ hours that the BETTY LOU was holding the barge on the beach, the barge was apparently riding well with the seas, and maintaining an even keel. There was absolutely no indication of any kind that the cargo was improperly loaded, or that the cargo had shifted until, within a matter of minutes, the barge suddenly listed violently to starboard, causing the damage complained of.

**CONCLUSIONS OF LAW**

**1.**

The Court has jurisdiction over this libel and venue is properly laid in the Eastern District of Louisiana.

**2.**

It is well settled that in a contract of towage, the owner of the tow or barge is responsible for the seaworthiness of the tow, and the owner of the tug or towing vessel is responsible for its safe navigation. Curtis Bay Towing Company of Virginia v. Southern Lighterage Corp., 4 Cir., 200 F.2d 33. The towing vessel is not an insurer of its tow. When damage or loss occurs to the tow or its cargo, if libelant is to recover therefor, he must carry the burden of proving, by a preponderance of the evidence, that the loss or damage was occasioned by the negligence of the towing vessel. Stall & McDermott v. The Southern Cross, 5 Cir., 196 F.2d 309; W. Horace Williams Co. v. The Wakulla, D.C., 109 F.Supp. 698.

**3.**

The towing vessel is not liable for the loss occasioned by the unseaworthiness of the tow unless its unseaworthiness is disclosed, or is so apparent that it would constitute negligence for the tug to attempt to proceed. Dameron-White Co. v. Angola Transfer Co., 5 Cir., 19 F.2d 12; Conners-Standard Marine Corp. v. Marine Fuel Transportation Corp., 135 F.Supp. 365. In the present case, the unseaworthiness of the HO&R 17 was not apparent, either at the commencement of the voyage nor at any time during the voyage until just a few minutes before it listed sufficiently to starboard to spill a portion of its cargo overboard. When it thus finally became apparent that the barge was improperly loaded, and that the cargo had shifted, it was much too late, even with the exercise of due diligence and reasonable care, to prevent the damage to the barge and the loss of a portion of its cargo. Indeed, after the starboard list of the barge was first noted, Captain Bruce and his deckhand, Lambas, barely had sufficient time within which to cast off the lines from the BETTY LOU and thus prevent the capsizing of the tug along with the barge.

**4.**

The libelant has failed to carry the burden of proving that the captain of the BETTY LOU was in any way negligent in the navigation of his tug and tow. On the contrary, the evidence preponderates in favor of respondent to the effect that Captain Bruce did exercise the care and

skill required and expected of a prudent navigator in the performance of his duties as captain of the BETTY LOU.

### 5.

The libelant, having failed to prove by a preponderance of the evidence that the damage to the barge HO&R 17 and the cargo loss was in any way caused by any negligence on the part of the BETTY LOU or its crew, judgment must therefore be entered herein in favor of respondent and against libelant, dismissing this libel at libelant's cost.