**STAR TOWING COMPANY, Inc.,**
Plaintiff,

v.

**The BARGE ORG–6504, her tackle, apparel, furniture, etc., in rem, and Orgulf Transport Company, in personam, Defendant.**

**Civ. A. No. 68–1510.**

United States District Court
E. D. Louisiana,
New Orleans Division.
June 24, 1969.

Edwin K. Legnon, New Orleans, La., for plaintiff.

George B. Matthews, New Orleans, La., for defendant.

RUBIN, District Judge:

Star Towing Company, Inc. (Star) seeks to recover expenses it incurred on

March 22, 23, and 24, 1966 in preventing the barge ORG–6504 (owned by Orgulf Transport Company (Orgulf)) from sinking. Additionally, Star claims 20% of the value of the barge and its cargo [1] as salvage.

## THE SETTING

Star contracted with Orgulf to tow Orgulf's loaded coal barges, ORG–5505 and ORG–6504, from New Orleans, Louisiana to Panama City, Florida. In preparation for the voyage, these two barges, along with others, were towed from Uniontown, Kentucky to Star's fleet in New Orleans by Orgulf's tug, the M/V ELAINE G, on a voyage that commenced on March 6, 1966. The barges were delivered to Star on March 11th and remained in the fleet until the morning of March 20, 1966. At that time, pursuant to the towage agreement between Star and Orgulf, Star's tug, the M/V ALGIERS POINT, removed the two barges from the fleet, and towed them through the Industrial Canal locks to approximately Mile 8 East in the Intracoastal Waterway. At this point the barges were moored to the south bank of the Waterway at approximately 3:05 p. m. because inclement weather was forecast.

In the vicinity of Mile 8 East, the Intracoastal Waterway runs generally east and west, so that, in mooring the barges to the south bank, the starboard side of the flotilla was facing inshore, toward the marsh, with the port side offshore. The ORG–6504, being a "box" barge, was made up to the stern of the ORG–5505. This was the same position in which the barges had been delivered to Star's fleet by the M/V ELAINE G.

At about 4:00 a. m., on March 22nd (37 hours after the barges had been moored), a Star employee reported that one of the barges was sinking. The M/V

1. The parties stipulated that the value of the ORG–6504 is $50,000 and the value of her cargo is $18,983.18, a total value of $68,983.18. It was further stipulated that, for the purpose of this suit, Orgulf was to be treated as the owner of the cargo. During the trial Orgulf dismissed a counterclaim for damages to the ORG–6504 and for lost or damaged rigging, without prejudice.

ALGIERS POINT was ordered to the rescue, and arrived at the scene at approximately 7:00 a. m. the same morning. Her crew began immediately to attempt to pump out the ORG–6504. The barge was in fact sinking, and her inshore bow corner was awash. There was considerable water in her forward rake compartment, wing tanks and cargo box. Additional pumps were brought on the scene by the plaintiff's M/V ANNE MARMAN at noon. Even with the additional pumps, the crews of the ALGIERS POINT and ANNE MARMAN could make no headway because the water was entering the barge faster than she could be pumped. During the rescue operations Orgulf was advised of the condition of the barge; however, Orgulf chose to rely on Star's efforts to save the vessel. At 9:00 p. m., Star dispatched its M/V DEE MARMAN to the scene with two additional pumps. During the pumping operations Star's personnel made temporary repairs to the barge so that the barge could be pumped to achieve sufficient freeboard to tow her to a shipyard for repair. In addition to the ALGIERS POINT, the ANNE MARMAN, and the DEE MARMAN, Star employed the M/V CALCO and the M/V JANET on March 23rd, to support the repair and pumping operations. Ultimately, Star rented two four inch pumps and, with the aid of these, succeeded in pumping the water from the barge.

On March 24, 1966, Star raised the barge to sufficient freeboard for towage, and towed it to Saucer Marine's shipyard for further repair. On September 30, 1966 Star billed Orgulf for $5,250.00 for services rendered, including 38 hours by the ALGIERS POINT, 27½ hours by the JANET, 56 hours by the ANNE MARMAN, 49½ hours by the DEE MARMAN,

and 28½ hours by the CALCO. Instead of honoring the invoice, Orgulf submitted its invoice of February 6, 1967 for $1,705.78 covering the repairs to the barge performed by Saucer Marine and Algiers Iron Works, claiming Star was responsible for the repairs. After discussions Star sued for both its expenses and a salvage award.

Orgulf claims that its barge was seaworthy, or, that, if it was not, its defects should have been discovered by Star. Star points to evidence of a large, old cement box (a temporary repair to stop leakage) in the hull, and various openings in the bow discovered when rescue operations began, and argues that these defects rendered the barge unseaworthy. Orgulf says, if the cracks in the hull were where Star's witnesses said, they were apparent and Star should not have accepted the towage.

But the facts convince me that the barge was not in seaworthy condition when the voyage began. Her unseaworthy condition was neither apparent nor readily ascertainable by simple visual inspection because her cargo compartment was laden with coal and she was made up tight to another barge.[2]

## TOWAGE VS. SALVAGE

Star was to tow the ORG–6504 under contract. It must show that the services it rendered the barge were not covered by its contract, that they amount to "salvage," as distinguished from "towage." In addition, of course, it may not recover if the peril from which the barge was rescued was caused by its negligence.

In a correct summary of the distinction drawn by the jurisprudence,[3] Norris

2. The testimony indicated that the *initial* fracture was located in the starboard rake end, or bow area, inboard from the rounded edge, about six or eight inches below the deck line. Since the rake end of the ORG–6504 was made up to the rake end of the ORG–5505 there was no way in which this fracture could have been seen. Although a sketch was offered in evidence

showing damage on the forward starboard *side*, not on the rake end, which would not have been obscured by the method of mooring, this latter damage probably resulted after the barge had begun taking on water from a leak in the rake end.

3. Sinclair v. Cooper, 1883, 108 U.S. 352, 2 S.Ct. 754, 27 L.Ed. 751; Mississippi

draws the classic line of demarcation between "salvage" and "towage":

> "A salvage service is a service which is voluntarily rendered to a vessel requiring assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger." Norris, The Law of Salvage § 188 (1958).

## THIS WAS SALVAGE

■■ The services rendered the sinking ORG-6504 were not merely to expedite her voyage. They were to relieve her from a real and unanticipated distress. They were properly to be considered salvage. A tug may, of course, recover salvage from its tow.[4]

Orgulf claims the distress resulted from Star's negligence. Star tied the vessel off in "the willows" on the Intracoastal Waterway and failed to make daily inspections. Orgulf claims that if the vessel had been inspected daily, the leak would have been discovered, the barge would have been pumped, and the distress would have been averted.

But this is mere conjecture. The barge was left unattended only 37 hours. There is nothing to indicate that the leak was there when she was tied off, nor is there any evidence that succor would have been simpler had the leak been discovered 12 or 18 hours sooner. (Of course, if the leak had been discovered earlier there would have been less water in the hull.) But the leak may well have occurred or been aggravated suddenly, only a short time before the actual discovery. It is certain that the barge was not in seaworthy condition, and there is no evidence either that her condition was the fault of Star or that earlier inspection would have changed the course of events.

■ The owner of the tow must deliver it to the tug in seaworthy condition.[5] Indeed, the tug master is entitled to rely upon the owner's warranty of seaworthiness unless it is apparent to him that the vessel is unseaworthy or that it would be negligent for him to proceed.[6]

Valley Barge Line Co. v. Indian Towing Co., 5 Cir. 1956, 232 F.2d 750; The Judith Lee Rose, Inc. v. The Clipper, D. Mass.1959, 169 F.Supp. 885; Kittelsaa v. United States, E.D.N.Y.1948, 75 F.Supp. 845. Compare, Valentine Waterways Corp. v. Tug Choptank, E.D.Va.1966, 260 F.Supp. 210, aff'd, 4 Cir. 1967, 380 F. 2d 381, where the court held that although the tug was not negligent, and the peril was caused by the tow's unseaworthiness, the efforts made were not "salvage" because the tug merely towed the barge back to port, a service comprehended by the contract of towage.

4. Sinclair v. Cooper, note 3 supra; The Connemara, 1883, 108 U.S. 352, 2 S.Ct. 754, 27 L.Ed. 751; The City of Portland, 5 Cir. 1924, 298 F. 27; The Santa Rita, 5 Cir. 1922, 281 F. 760; Valentine Waterways Corp. v. Tug Choptank, note 3 supra; Hendry Corp. v. Aircraft Rescue Vessels, E.D.La.1953, 113 F.Supp. 198.

5. Curtis Bay Towing Co. of Va. v. Southern Literage Corp., 4 Cir. 1952, 200 F. 2d 33; Federazione Italiana D.C.A. v.

Mandask Compania De Vapores, S.D. N.Y.1966, 284 F.Supp. 356, rev'd on other grounds, 2 Cir. 1968, 388 F.2d 434; Derby Co. v. A. L. Mechling Barge Lines, Inc., E.D.La.1966, 258 F.Supp. 206; South, Inc. v. Moran Towing and Transportation Co., S.D.N.Y.1965, 252 F.Supp. 500, aff'd, 2 Cir. 1966, 360 F.2d 1002; Otto Candies, Inc. v. Great American Ins. Co., E.D.La.1963, 221 F.Supp. 1014, aff'd, 5 Cir. 1964, 332 F.2d 372; Detyens Shipyards, Inc. v. Marine Industries, Inc., E.D.S.C.1964, 234 F.Supp. 411, aff'd, 4 Cir. 1965, 349 F.2d 357; Stall & McDermott v. The Southern Cross, E.D. La.1951, 95 F.Supp. 612, aff'd, 5 Cir. 1952, 196 F.2d 309; Ohio River Company v. M/V Irene Chotin, E.D.La.1965, 238 F.Supp. 114.

6. South, Inc. v. Moran Towing and Transportation Co., 2 Cir. 1966, 360 F. 2d 1002; New Orleans Coal & Bisso Towboat Co. v. United States, 5 Cir. 1936, 86 F.2d 53; Dameron-White Co. v. Angola Transfer Co., 5 Cir. 1927, 19 F.2d 12; Dady v. Bacon, 2 Cir. 1906, 149 F. 401; Central Railroad Co. of New Jersey v. Tug Marie J. Turecamo, E.D.

The barge sank while moored to a bank in calm weather after an uneventful tow through tranquil waters. We need not rely upon, although we note that there is a presumption that, when a barge sinks in calm weather, absent proof of improper handling, the sinking was caused by the unseaworthiness of the barge.[7] Furthermore, the tow owner bears the burden of proving that its vessel was damaged as a result of the tug's negligence—there is no presumption on that issue.[8] This Orgulf did not even attempt to do.

## AMOUNT OF AWARD

Concluding therefore that Star is entitled to salvage, we turn to fixing the amount of the award. "[T]he wisdom of a policy assuring a money award for successful rescue of distressed property is as equally desirable and salutary today as it was a century ago," Norris says, in The Law of Salvage, § 233 at 371 (1958).

"Maritime salvage is not reserved for hero alone," Mississippi Valley Barge Line Co. v. Indian Towing Co., 5 Cir. 1956, 232 F.2d 750, 755, reminds us. "Its generous but judicious liberality is to encourage mariners instinctively to respond to need—be it great or small, drab or spectacular, certain in the knowledge that the scale of The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870, provides the means to find a balance." 232 F.2d at 755.

" 'Public policy requires that such a promise of reward should be held out, in case of success, that all those in a situation and competent to render relief, shall be eager to do so, from the mere hope of gain; for example, that the sailor who alone sees from the masthead a vessel in distress, or the master, who decries her at a distance, with a telescope, shall not be tempted to pass her by, but shall have a prospect of pecuniary advantage, which may prompt his efforts.' " Norris, The Law of Salvage, § 233 at 371, quoting Judge Sprague in The Missouri, D.C.Mass.1854, 17 Fed.Cas. No. 9,654.

In The Blackwall, 1870, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870 the United States Supreme Court stated the criteria generally considered in fixing a salvage award. These have been summarized as follows:

"1. The degree of danger from which the * * * property [is] rescued.

2. The value of the property saved.

3. The risk incurred by the salvors in securing the property from the impending peril.

4. The promptitude, skill and energy displayed by the salvors in rendering the service and saving the property.

5. The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed.

6. The time and labor expended by the salvors in rendering the salvage service." Norris, The Law of Salvage, § 245 at 386 (1958).

Here the salvage was not effected in hazardous conditions, nor was a voyage interrupted to effect it. There was no danger to Star's personnel or equipment. Testimony indicated that traffic in the vicinity of Mile 8 East was

---

N.Y.1965, 238 F.Supp. 145; Choctaw Transp. Co. v. Ford Const. Co., N.D. Miss.1961, 193 F.Supp. 922; Conners-Standard Marine Corp. v. Marine Fuel Tr. Corp., E.D.N.Y.1955, 135 F.Supp. 365.

7. South, Inc. v. Moran Towing and Transportation Co., note 5 *supra*; Derby Co. v. A. L. Mechling Barge Lines, Inc., note

5 *supra*; Ohio River Company v. M/V Irene Chotin, note 5 *supra*; Louisiana Materials Co. v. Royal Pellegrin, E.D. La.1962, 211 F.Supp. 4.

8. The Lapwing, 5 Cir. 1945, 150 F.2d 214; Otto Candies, Inc. v. Great American Ins. Co., note 5 *supra*; Ohio River Company v. M/V Irene Chotin, note 5 *supra*.

very light and that the area where the barges were secured was a customary mooring site for tows during rough weather. Although the weather was at times cold and windy and there was light rain, the waterway, being an inland channel, was not hazardous. Star did not respond to an SOS signal. The sinking vessel had been in its custody. When Star rendered aid, it was fulfilling an obligation, albeit one for which it was entitled to be rewarded. Nor can we overlook the probability that the salvage efforts were prompted by the hope of retaining the custom of Orgulf.

Motivated, perhaps by such notions, Star billed Orgulf at first merely for its services in the sum of $5,250.00. Only when the bill had been rejected and it was apparent that its customer's good will had been lost was the additional claim filed.

There are of course precedents for allowing more for salvage than was originally demanded.[9] And it is customary to reimburse for out-of-pocket expenses before reaching the question of compensation for salvage.[10] But here a good part of the bill was compensation for the use of Star's tugs and personnel. It can hardly be said that Star's response was measured. Indeed, it overreacted. Five tugs were used for a total of 199½ hours. At many times two or three tugs were on the scene. The salvage operation was conducted with waste and duplication of effort.

Considering all of these factors, judgment will be rendered in favor of Star and against Orgulf in the sum of $5,250.-00 with interest from September 30, 1966, the date of Orgulf's rejection of Star's initial claim. A form of judgment will be prepared by Star's counsel and submitted to the court after obtaining approval by Orgulf's counsel. This opinion will serve in lieu of findings of fact and conclusions of law.

9. The Magnolia, N.D.Calif.1918, 253 F. 400; The Lackawanna, W.D.N.Y.1915, 220 F. 1000.

10. Lykes Bros. Steamship Co. v. The Flying Boat, S.D.Calif., 1957 A.M.C. 1957.