Tracy D. LANCASTER, as owner of the
SHRIMP BOAT, GLORIA KAY,
Plaintiff,

v.

Larry SMITH, and the SAILING YACHT,
CHANDRA, Defendants.

Larry SMITH, and the SAILING YACHT,
CHANDRA, Plaintiff by counter-
claim,

v.

Tracy D. LANCASTER, as owner of the
SHRIMP BOAT, GLORIA KAY, De-
fendant by counter-claim.

Civ. A. No. 5842–70–T.

United States District Court,
S. D. Alabama, S. D.
July 20, 1971.

Artice McGraw, Phillips, William Mc-
Graw & Cetti, Pensacola, Fla., for plain-
tiff.

A. Clay Rankin, III, Hand, Arendall,
Bedsole, Greaves & Johnstone, Mobile,
Ala., for defendants.

DANIEL HOLCOMBE THOMAS,
Chief Judge.

The above-styled case was regularly
set down for trial on June 4, 1971, and
after hearing and considering the evi-
dence and arguments of counsel, the

Court makes the following Findings of Facts and Conclusions of Law:

## FINDINGS OF FACT

1. This is an *in rem* proceeding against the Motorsailer, CHANDRA, and *in personam* against her owner, Larry Smith, for salvage by Tracy D. Lancaster, owner of the fishing vessel, GLORIA K. The alleged salvage operation took place on January 5, 1970, in the Mississippi Sound between Pascagoula, Mississippi, and Dauphin Island, Alabama. The defendant has filed a counterclaim against plaintiff for damages suffered by the CHANDRA as a result of plaintiff's negligence.

2. The Motorsailer CHANDRA is a thirty-five foot fiberglass hull, fixed keel, sailing yacht with a 10.5 foot beam and a 5.15 foot draft. The vessel has a 75 h. p. diesel engine. The GLORIA K is a fifty-seven foot wooden hull, shrimp boat with a 15′ 9″ beam and 4½ foot draft. The CHANDRA was built in Hong Kong in 1969. Her purchase price in November 1969 was $28,000.00. The GLORIA K was built in Biloxi, Mississippi, in 1944. Lancaster purchased her in 1968 for $6,500.00 but he estimated her value on January 5, 1970, at $15,-000.00.[1]

3. Both plaintiff and defendant were in the Port of Pascagoula in January 1970, while their boats were undergoing repairs at the same shipyard. Plaintiff had by gentleman's agreement agreed to assist the defendant and his wife if they experienced any more engine trouble, but Lancaster was under no contractual obligation to do so. Both parties left Pascagoula at about 12:00 Noon on January 5, 1970.

4. The CHANDRA developed engine trouble shortly after leaving the Pascagoula Channel. Smith did not drop anchor, but apparently waited for Lancaster to turn around and assist them. Lancaster did in fact return and threw them a tow line. Smith asked to be towed back into Pascagoula but deferred to Lancaster's judgment that it would be better to continue toward Dauphin Island. At the time the tow was commenced, Lancaster said the CHANDRA was dangerously close to the spoil area west of the channel but Smith claims she was on the eastern edge of the shipping safety fairway, in no danger at all. Since little time elapsed between the time the CHANDRA developed engine trouble and the time the tow commenced, the Court finds that the CHANDRA was not in imminent danger from the spoil area.[2]

5. Lancaster towed the CHANDRA to the vicinity of Dauphin Island—about 15 miles away—without incident. The GLORIA K ran aground off Dauphin Island and the CHANDRA did the same shortly thereafter. The GLORIA K dislodged herself after about an hour and then without difficulty dislodged the CHANDRA.

6. After the grounding, Lancaster moved north of the Island where both vessels dropped anchor.[3] For some reason, the GLORIA K's anchor did not hold or the anchor line parted under the strain, causing her to drift away from the CHANDRA. Smith apparently released the tow line when he dropped his anchor.

7. The Court finds that Smith was not guilty of any negligence in releasing the tow line. If the floating tow line broke the rudder on the GLORIA K, it would be attributable to the poor condition of the tiller arm[4] rather than Smith's timing in releasing the line.

---

1. Captain Paul Wright, a marine surveyor, hired by defendant estimated her value in January 1971, at $7,500.00.

2. However, in view of the fact that there was a wind of 25–30 knots, together with the fact that the CHANDRA's anchor did not prevent a subsequent grounding on Dauphin Island, the Court does find that the CHANDRA was in some degree of peril.

3. The Court finds that the CHANDRA did not circle the GLORIA K as Lancaster claims since she was still without power.

4. Mobile County Deputy Sheriff Pete Patronas, who was the first to reach the beached GLORIA K, testified that Lancaster said the weld on the rudder arm broke loose. Patronas described it as a

8. The GLORIA K was beached during the night and suffered severe damage. The Court finds that the beaching was attributable to the negligence of Lancaster in failing to use an available anchor. Deputy Patronas testified that when he reached the GLORIA K, an anchor was hanging on the bow. He further testified that since only the bow of the GLORIA K was aground, he recommended that Lancaster back her off. Upon learning the batteries were dead, the Deputy further recommended throwing out her anchor in order to prevent her from coming further ashore, but Lancaster declined to do so. In view of the above findings, the Court makes no findings on the extent of the GLORIA K's damages.

9. The CHANDRA was also beached but on the following night of January 6, 1970. The Court finds that that beaching was solely because of the negligence of the defendant, Larry Smith. Smith was able to repair, however temporarily, his engine at approximately 12:30 P.M. on January 6th but decided to remain at what he thought was a safe anchor.[5] Although he was put on notice that the anchor appeared to be dragging, Smith took no action to avoid the grounding despite the fact that his engine was operable. In view of this finding, the Court also does not make any findings on the extent of the CHANDRA's damage.

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction under Title 28, U.S.C.A., § 1333.

■ 2. If a vessel is in peril reasonably to be apprehended, a rescue operation that involves simply towing the stranded vessel is considered a salvage operation, although salvage of a low order. Mississippi Valley Barge Line Co. v. Indian Towing Co., 232 F.2d 750 (5th Cir. 1956).

■ 3. The existence of the prior "gentlemen's agreement" between Lancaster and Smith to assist if needed does not relegate what would otherwise be a salvage operation to a towing operation only. Gilmore & Black, Law of Admiralty § 8-4 (1957).

■ 4. The peril to which a vessel is subjected need not be one of imminent danger of destruction or damage. Rather it is sufficient that a vessel be subject to potential danger of damage or destruction to make her subject to salvage services. Fort Myers Shell & Dredging Co. v. Barge NBC 512, 404 F.2d 137 (5th Cir. 1968); Mississippi Valley Barge Line Co. v. Indian Towing Co., supra.

5. This Court in Seaman v. Tank Barge OC601, 325 F.Supp. 1206 (1971) held that the

"criteria generally considered in fixing a salvage award were established by the Supreme Court in 1870 in The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870. These have been summarized as follows:

"1. The degree of danger from which * * * property [is] rescued.

2. The value of the property saved.

3. The risk incurred by the salvors in securing the property from the impending peril.

4. The promptitude, skill and energy displayed by the salvors in rendering the service and saving the property.

---

piece of metal welded across the top of the break.

5. At least two safe docks were available on the closeby island, both of which were considerably closer to the CHANDRA than the Pascagoula harbor was when she accepted the tow. Further the CHANDRA was equipped with a fathometer that Smith testified was still operating after the first grounding off Dauphin Island. No evidence was introduced showing that the fathometer was even checked when he first suspected she was dragging her anchor.

5. The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed.

6. The time and labor expended by the salvors in rendering the salvage service."

Norris, The Law of Salvage, § 245 at 386 (1958).

■■ 6. The cost of repairing damages suffered by the salving vessel during the salvage operation may also be a factor in determining a salvage reward but the Court has found that none of the damages suffered by the GLORIA K were a result of the salvage operation. All of her damages occurred while the salvage operation had temporarily ceased.

■■ 7. It is unquestioned that salvage awards are not *quantum meruit*, but are rewards for seamen who voluntarily act to rescue life and property from the perils of the sea. It is public policy that these awards be liberal in order to encourage mariners to instinctively respond to need. Mississippi Valley Barge Line Co. v. Indian Towing Co., supra; Star Towing Company v. Barge ORG–6504, 301 F.Supp. 819 (E.D.La. 1969), Seaman v. Tank Barge OC601, supra.

8. The defendant is not entitled to compensation for the damages [6] suffered by the CHANDRA in the subsequent beaching because the beaching was not in anyway attributable to plaintiff's negligence.

Therefore, in consideration of the above findings of fact and conclusions of law, the Court is of the opinion that the plaintiff is entitled to a salvage award of $500.00.

A judgment will be entered in accordance with the above.

<hr />

6. The defendant did not attempt to show that the CHANDRA suffered any damages from the first grounding off Dauphin Island.